

1  GOODIN, MACBRIDE, SQUERI,
       DAY & LAMPREY, LLP
2  Wayne T. Lamprey, Bar No. 095408
       wlamprey@goodinmacbride.com
3  Anne Hayes Hartman, Bar No. 184556
       ahartman@goodinmacbride.com
4  505 Sansome Street, Suite 900
   San Francisco, California  94111
5  Telephone:  (415) 392-7900
   Facsimile:  (415) 398-4321
6
7  Attorneys for Plaintiff-Relator
   Mario Rizzo

8                UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10  UNITED STATES OF AMERICA *ex*        Case No. 10-CV-7409 PA (AJWx)
    *rel.* Mario RIZZO,
11                                       **SECOND AMENDED COMPLAINT
                     Plaintiffs,         FOR VIOLATIONS OF THE FALSE
12                                       CLAIMS ACT**
    v.
13                                       **JURY TRIAL DEMANDED**
    HORIZON LINES, LLC, a Delaware
14  Limited Liability Company;
    MATSON NAVIGATION
15  COMPANY, INC., a Hawaii
    Corporation; and,
16  CARTWRIGHT INTERNATIONAL
    VAN LINES, INC., a Missouri
17  Corporation;
18                   Defendants.
19

20       Plaintiff Mario Rizzo, in his capacity as a Relator ("Relator"), files this

21  Second Amended Complaint against defendants and alleges as follows:

22                         **INTRODUCTION**

23       1.    This action is brought on behalf of the United States pursuant to the

24  False Claims Act, 31 U.S.C. sections 3729, et seq. (hereinafter "the Act"), and

25  pursuant to the provisions of the Act which allow individuals with knowledge of

26  violations of the Act to file suit on behalf of the government.  Before this action

27  was filed by Relator, the violations of the Act alleged herein were never publicly

28  disclosed.

Case No. 10-CV-7409 PA (AJWx)          - 1 -          **SECOND AMENDED COMPLAINT**

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2.     This lawsuit arises out of a long running scheme to defraud the Surface Deployment and Distribution Command ("SDDC") of the Department of Defense ("DoD") in connection with the shipment of household goods for military personnel in the Army, Navy, Air Force, Marines, and Coast Guard ("military HHG" or "HHG"). The shipments involved were between Hawaii or Guam , on the one hand, and points in the continental United States ("CONUS") on the other hand. The military HHG were transported by ship between Hawaii or Guam and ports on the west coast of the United States, and to or from there by rail (or infrequently by truck) to other locations in CONUS. Shipments of this type are referred to as "intermodal" shipments, requiring two types or modes of transport: ocean transportation by ship, and inland or "line haul" transport by train or truck.

3.     The SDDC rate solicitations for these types of shipments provide that the SDDC will, subject to certain conditions, pay carriers a so-called "bunker fuel surcharge" to account for changes in the cost of a type of fuel used only by ships – bunker fuel. The SDDC, however, expressly prohibits all fuel surcharges for "any type of rail shipment," limits fuel surcharges on truck transportation, and specifies that these prohibitions apply to the "domestic line haul portion" of the intermodal shipments at issue.

4.     Despite this clear prohibition, the defendants – two ocean carriers and one freight forwarding company, each of which handled shipments of military HHG for the SDDC – routinely included in their freight bills for intermodal shipments fuel surcharges on the rail or line haul portion of the shipments. The prohibited fuel surcharges, however, were concealed and falsely labeled. The defendants' bills included a single purported bunker fuel surcharge which had been inflated to encompass the rail or line haul portion of the transport. Notwithstanding SDDC rules that so required, the purported bunker fuel surcharges were not separately or accurately set forth, and the defendants' billings were both false and fraudulent claims and false writings.

5.      The defendants knew that the fuel surcharges they were imposing on the line haul portion of SDDC shipments were illegal, and took steps to conceal the prohibited charges from the SDDC.  In late 2006 and early 2007, shortly before a policy statement expressly prohibiting rail fuel surcharges became effective, two of the defendants communicated about what to do to address this looming "problem," and how best to "ensure" that the SDDC would be tricked into paying the prohibited rail fuel surcharge.  The defendant carriers combined the prohibited rail fuel surcharge with the otherwise legitimate surcharge on fuel for ocean transport (the actual bunker fuel surcharge), and falsely and fraudulently labeled the combined and inflated fuel surcharge.

6.      Deceived by the defendants' false and fraudulent billings, and unaware that the fuel surcharges on defendants' bills were inflated and included a disallowed surcharge, the SDDC paid them in full.

7.      The defendants, as described with greater particularity below, knowingly presented and caused to be presented false and fraudulent claims for payment to the SDDC; and made, used and caused to be made and used false and fraudulent records and statements material to false claims, in violation of the False Claims Act.

## PARTIES

8.      Relator is an individual and a resident of Illinois.

9.      Plaintiff United States of America is acting on behalf of the Department of Defense ("DoD"), Surface Deployment and Distribution Command ("SDDC"), formerly known as Military Traffic Management Command, a command of the United States Transportation Command, serving the Army, Navy, Air Force, Marines, and Coast Guard.  During the relevant time period, SDDC had its headquarters in Alexandria, Virginia and at Scott Air Force Base, Illinois.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10.   Defendant Horizon Lines, LLC ("Horizon"), is a limited liability corporation organized and operating under the laws of the State of Delaware with its principal place of business in Charlotte, North Carolina.

11.   Defendant Matson Navigation Company, Inc. ("Matson"), is a corporation organized and operating under the laws of the State of Hawaii with its principal place of business in Oakland, California.

12.   Defendants Horizon and Matson are referred to herein collectively as "Ocean Carrier Defendants."

13.   Defendant Cartwright International Van Lines, Inc. (Cartwright) is a corporation organized and operating under the laws of the state of Missouri, with its principal place of business in Grandview, Missouri.

14.   Defendants Horizon, Matson, and Cartwright are referred to herein collectively as "Defendants."

## JURISDICTION AND VENUE

15.   This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 31 U.S.C. § 3732 (federal court jurisdiction for actions brought pursuant to 31 U.S.C. § 3730).

16.   Venue is proper in this district pursuant to 31 U.S.C. § 3732(a), because Defendant(s) transact business, including shipping goods through this District as alleged in this complaint, and under 28 U.S.C. 1391(b) and 1395(a).

## ALLEGATIONS COMMON TO ALL CLAIMS

### The Shipments Involved

17.   The DoD, through the U.S. Transportation Command, and its subordinate military command, SDDC, contracts for the transportation of household goods belonging to servicemen and servicewomen when they are relocated.  The items transported are commonly referred to as either "military HHG," or "Defense Personal Property."  This lawsuit concerns shipments of military HHG between, on the one hand, Hawaii or Guam, and, on the other hand,

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  the continental United States ("CONUS"). Such shipments fall within the DOD

2  definition of "international shipments."

3       18.   More specifically, this lawsuit concerns international shipments of

4  HHG where the transport involves both ocean transport by ship, and long-distance

5  transport over land within CONUS by rail or truck. For example, to move a soldier

6  from Schofield Barracks in Oahu to Fort Benning, Georgia, would require: (1) local

7  Hawaii moving and storage companies to pack the HHG into wooden crates called

8  "liftvans" at the soldier's home, and transport those to the port in Honolulu, (2)

9  Honolulu port agent services, (3) ocean transport services, (4) mainland port agent

10  services, and (5) mainland moving and storage companies to, again, get the freight

11  over land to the soldier's new home in Fort Benning in western Georgia.

12  Shipments of this sort are referred to in the shipping industry as "intermodal"

13  shipments; i.e. shipments that require multiple modes of transport – ocean transport

14  by ship, and overland or line haul transport by rail (or less frequently by truck).

15       19.   Freight forwarders, like defendant Cartwright, contract with the SDDC

16  to manage the move from door to door. It is the freight forwarders who arrange for

17  each of the steps outlined above, contracting with others as needed. Among those

18  the freight forwarders contract with are ocean carriers, such as the Ocean Carrier

19  Defendants. Ocean carriers are typically responsible for moving the liftvans with

20  the HHG from the port of origination to a port near the ultimate destination.

21       20.   The Ocean Carrier Defendants both operate ships that move military

22  HHG between Hawaii and/or Guam and ports on the west coast of the United

23  States. All such transport must be performed by "Jones Act" carriers, those

24  meeting the requirements of the Jones Act, 46 U.S.C. § 101 et seq. The Ocean

25  Carrier Defendants each operate "Jones Act" fleets, and collectively handle

26  approximately 96% of the Jones Act freight between CONUS and Hawaii and

27  100% of the Jones Act freight between CONUS and Guam.

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21.     Because the Ocean Carrier Defendants' ships call only on west coast ports, for intermodal shipments where the CONUS point of origination or destination is not in the western United States, the Ocean Carrier Defendants contract with others to transport the military HHG over land to or from a point that is near the destination or point of origin.  This inland, east coast, or gulf coast delivery or pick-up point is typically a rail ramp terminal – an intermodal rail yard, where military HHG can be loaded or unloaded for local service providers, who will handle the local leg to or from the service member's local residence.  In this way, the Ocean Carrier Defendants could book the hypothetical Hawaii-to-Georgia move by providing freight from Honolulu to the port/rail ramps in Jacksonville, Florida or Charleston, South Carolina, even though they do not have any ships that go to those ports.  The Ocean Carrier Defendants receive and pay bills from the railroads or trucking companies for this overland transportation.

22.     The SDDC issues a Government Bill of Lading ("GBL"), also sometimes referred to as a Personal Property Government Bill of Lading ("PPGBL") when the shipment is arranged.  When the shipment is complete, the freight forwarder bills the SDDC for the entire shipment, submitting the completed GBL with required supporting documentation, including bills or invoices submitted to the freight forwarders by the Ocean Carrier Defendants.   Although the Ocean Carrier Defendants' invoices to the freight forwarders for intermodal shipments encompass the overland transport segment, for the shipments at issue here, the Ocean Carrier Defendants do not set forth a separate charge for the rail or line haul transport, and do not forward the billings from the railroads or trucking companies to the freight forwarders.  Since approximately 2010, the freight forwarders have submitted their bills electronically and have retained the invoices from the Ocean Carrier Defendants for potential inspection by the SDDC.

23.     Both freight forwarders and ocean carriers are referred to as "Transportation Service Providers" or "TSPs."  Freight forwarders shipping

1   military HHGs are also referred to as "ITGBL transportation service providers," in

2   reference to the "International Through Government Bills of Lading" pursuant to

3   which they provide service, and ocean carriers are also referred to as "ocean

4   transportation service providers."

5        24.    The Ocean Carrier Defendants and the freight forwarders, including

6   Cartwright, are aware that the shipments of military HHG at issue are for the SDDC

7   and subject to the terms and rules described below.

8         **The Governing Rules:  SDDC "Rate Solicitations" and "TR-12"**

9        25.    The HHG shipments and billings at issue are controlled by

10  "International Personal Property Rate Solicitations" issued periodically by the

11  SDDC.   Relevant chapters of Rate Solicitation I-25, issued May 10, 2010, are

12  attached as Exhibit A.  As the Rate Solicitation itself states, it "provides guidelines,

13  rules, regulations and other information required to participate in the movement of

14  personal property worldwide." (Exh. A, Item 100, Bates p. 13)  Exhibit A is

15  representative of the Rate Solicitations issued by the SDDC throughout the period

16  at issue (the Rate Solicitation preceding Exhibit A was I-24; the following was I-26.

17  They were renamed as "Defense Personal Property Program International Tenders"

18  in 2011).

19       26.    The Rate Solicitation sets forth the terms and conditions governing

20  different types of transportation services, referred to as "Codes of Service." (Exh.

21  A, Item 407, "Description of Codes of Service," Bates p. 42)  The service involved

22  in this lawsuit is "Code 4 – International Door-to-Door Container," defined as the

23  "Movement of HHG in containers whereby a Transportation Service Provider

24  provides completely through service from origin residence to the destination

25  residence over land and/or ocean means." (Id.)

26       27.    Freight forwarders submit bids in response to the Rate Solicitation

27  setting forth the rates that they will charge the SDDC during the time period

28

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   governed by the Solicitation (the "rate cycle").[1]  The path between each possible

2   origin and destination point is referred to as a "channel," and freight forwarders bid

3   for each channel they are interested in serving.  The freight forwarder rates for

4   Code 4 "door-to-door" service in each channel are commonly known as "through

5   rates" or "single-factor rates" ("SFR").  In each rate cycle, originating military

6   installations' transportation offices book shipments in each channel with the low

7   bid freight forwarder for that channel, or other freight forwarders who agree to

8   match those rates or have a comparable or better "best value" score.

9       28.    In advance of each rate cycle, the Ocean Carrier Defendants create and

10  publish rates for ocean and intermodal transportation specifically for military HHG

11  shipments.  The Ocean Carrier Defendants create and publish these rates knowing

12  that the freight forwarders will use them to prepare their bids to the SDDC for the

13  upcoming rate cycle, and knowing that service will be provided pursuant to SDDC

14  rules.

15      29.    A rate that is established by this bidding process is required to cover

16  every aspect of the shipment, including fuel costs.  The Rate Solicitation, however,

17  allows for the possibility that the freight forwarder TSPs may be required to pay

18  other TSPs they contract with, such as the Ocean Carrier Defendants, higher

19  amounts than anticipated when the through rate was fixed.  The Rate Solicitation

20  permits freight forwarder TSPs to pass on some of these unanticipated costs in the

21  form of "surcharges," also known as "accessorial charges" and "supplemental

22  bills."  Item 432 of the Rate Solicitation spells out that some unusual or variable

23  costs associated with land, water and air transportation are not covered by the single

24  factor rate.  This is done so that the TSPS do not need to increase their rates to

25  _____

26  [1] Until 2011, each international rate cycle was six months long, with a "summer"
    period, referred to as International Summer [Year], or IS-[Year] and a "winter"
27  period, referred to as IW-[Year].  With the rate cycle beginning May, 2011, the
    Defense Personal Property Program International Tender covered a 12 month rate
28  cycle, each referred to as IT-[Year].

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    account for the possibility that these circumstances will arise (which would result in

2    inflated rates and bids).  The ocean carriers and freight forwarders instead are able

3    to recoup these costs as allowed "surcharges," when justified.  The Rate Solicitation

4    defines a "surcharge," as "[a]n extra fee, levied to a shipment, paid by the

5    transportation service provider and sometimes reimbursed by the U.S.

6    Government." (Exh. A, Item 252, Bates p. 23)

7         30.    Five and only five surcharges are allowed and they are set out in Item

8    252 of the Rate Solicitation.  The surcharge at issue here is the "Bunker Surcharge,"

9    which the Rate Solicitation defines as follows:

10           Bunker Surcharge (BSC) – An extra charge, also known

11           as Bunker Adjustment Factor (BAF) or Fuel Adjustment
        Factor (FAF), sometimes added to ocean TSP rates.  This

12           surcharge is justified by higher fuel costs.  This surcharge
        is applicable to codes of service 1, 2, 3, 4, and 7.

13   (Exh. A, Item 252, Bates p. 23)  The bunker surcharge is so named because of the

14   type of fuel used by ships: "bunker fuel."  Bunker fuel is not used in any other

15   transportation application, and any reference to "bunker fuel," "bunker surcharges,"

16   or "bunker adjustments" is, by definition, a reference to ocean transportation only.

17        31.    Bunker fuel surcharges can be substantial.  Ocean carriers began to

18   impose them in the 1990's and at that time the purported justification was to meet

19   the higher cost of the bunker fuel used by ships.  Initially the surcharge was small –

20   less than 5% of the transportation rate.  However, over time, the bunker fuel

21   surcharge imposed by the Ocean Carrier Defendants steadily climbed, to rates as

22   high as 40% of the freight charge, with only occasional deviations downward.

23        32.    Item 432 of the Rate Solicitation provides that the rate established by

24   the competitive bidding process includes "[a]ll land, water and air transportation,

25   EXCEPT" certain items, including the five surcharges permitted by Item 252.

26   Further, Item 432 includes certain requirements related to these surcharges,

27   designed to prevent fraud and abuse.  In order to be reimbursed for an allowed

28   bunker surcharge, the freight forwarder must have actually incurred a bunker

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    surcharge for the same amount, and received a bill from the ocean carrier involved
2    that supports its claim for reimbursement.  The freight bill from the ocean carrier
3    must set forth the "actual amount" of the bunker surcharge and do so "separately"
4    from any other charges.  Item 432 states that the five permitted surcharges can be
5    billed to the government only "[w]hen actually billed to the ITGBL Transportation
6    Service Provider [the freight forwarder] by ocean freight Transportation Service
7    Provider, air Transportation Service provider, or port agent." (Exh. A, Bates p. 71)
8    Further, Item 432 requires that, "[s]uch charges will be separately stated on the
9    GBL and supported by prorated ocean, air Transportation Service Provider or port
10   agent invoices for the actual amount." (Id.)  In short, the SDDC will only pay a
11   bunker fuel surcharge if the ocean carrier TSP provides the freight forwarder TSP
12   with a bill stating the "actual amount" of the bunker surcharge (not the bunker
13   surcharge plus some other unauthorized charge), and the freight forwarder has this
14   bill from the ocean carrier to support its own invoice to the SDDC.

15        33.    With respect to overland transportation of HHG, the SDDC will not
16   pay a fuel surcharge for transport by rail, and will pay a fuel surcharge for transport
17   by truck only if the price for diesel exceeds a certain benchmark.  Item 432 of the
18   Rate Solicitation directs parties to:  "See Item 513 for application of the Fuel
19   Surcharge for CONUS line haul, including Alaska and Hawaii." Item 513 allows
20   for a fuel surcharge on inland transportation but it "appli[ies] only to any inland
21   transportation segment within CONUS where a Fuel Surcharge applies to that
22   segment of a shipment transported by truck." (Exh. A, Item 513, Bates p. 113)
23   Item 513 only permits fuel surcharges for inland transport by truck, and refers to the
24   SDDC's "Fuel-Related Adjustment Policy No. TR-12." Complementing Item 513
25   – which only permits a fuel surcharge on inland transport by truck – TR-12
26   expressly prohibits any fuel surcharge on inland transport by rail. (Exh. B at ¶ 1.a)

27        34.    Consistent with Item 513 and the reference to it in the Rate
28   Solicitation, TR-12 itself expressly states that it applies to "the domestic line haul

1   portion of international movements" and "the line haul portion of domestic

2   interstate and intrastate movements including Alaska and Hawaii." (Exhibit B at

3   ¶2)  TR-12 makes crystal clear the absolute prohibition on any fuel surcharge

4   related to transport by rail, including rail shipments that are part of intermodal

5   shipments.  Effective as of April 1, 2007, it was revised to state that the SDDC will

6   not: "pay an FRA [fuel-related adjustment] for any type of rail shipment." (Exh. B,

7   ¶1.a)  With respect to truck transportation, TR-12 only authorizes fuel surcharges if

8   and to the extent that diesel fuel costs exceed a specific baseline.

9        35.   The provisions of the Rate Solicitation and TR-12, including

10   compliance with the limits and prohibits related to fuel surcharges for inland

11   transport, were conditions of payment.  The SDDC would not have paid the fuel

12   surcharges involved had the SDDC known the true facts and specifically that the

13   fuel surcharges included on the Defendants' bills covered rail and line haul

14   transportation, and therefore were not bunker fuel surcharges as authorized and

15   permitted by the Rate Solicitation and TR-12.  By submitting bids pursuant to the

16   Rate Solicitation, and by registering as TSPs, the defendants certify that they will

17   abide by the terms of the Rate Solicitation.  (Items 251, 300, 400, and 405, and

18   Chapter V Item 5.)

19   **The Defendants Knowingly Presented and Caused to be Presented False and
     Fraudulent Claims, Created and Used False Records Material to those Claims,**

20   **and Conspired to Defraud the SDDC**

21        36.   The Defendants designed, created and used false writings in support of

22   false and fraudulent claims, and submitted and caused to be submitted false and

23   fraudulent claims.

24        37.   The Defendants and each of them were familiar with the requirements

25   of the Rate Solicitations issued by the SDDC and with the provisions of TR-12.

26        38.   Each of the Defendants employed personnel responsible for the

27   shipping of military HHG.  Military HHG shipments are a substantial market, and

28   account for a large percentage of the HHG shipping market to and from Hawaii and

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    Guam, and of each of the Defendants' businesses in those regions.  The employees

2    of the Defendants who had responsibility for this area and were aware of the terms

3    and content of the Rate Solicitations and TR-12 were: at Cartwright, Ken Selvey

4    served the military HHG market; at Matson, John Rowan, who was the "Manager,

5    National Accounts/Household Goods," did the same; and at Horizon, Hugh Healey

6    served as the "Director, Government Sales & Marketing."

7        39.    Defendants Horizon and Matson each periodically revised and

8    published their rates and terms for the shipment of military HHG throughout the

9    relevant time period.

10       40.    Horizon issued "Household Goods Rate Guide[s]" in advance of each

11   military HHG rate cycle.  Copies of representative Rate Guides issued by Horizon

12   are attached as Exhibit C.  The Rate Guides confirm Horizon's related knowledge

13   and expertise.  Horizon's Rate Guide for "Military's Year 2007 Winter Cycle," for

14   example, states:

15           This guide provides household goods shippers with ocean
             rates for the Military's Year 2007 Winter Cycle.  The
16           rates have been forward filed in their respective tariffs so
             that military household carriers can be aware of ocean
17           costs before filing their through rates with the
             government.
18
             Please be advised that all assessorial charges, such as
19           wharfage, fuel, security, etc. are subject to change at any
             time.
20

21       41.    Matson also issued rate guides specifically for the shipment of military

22   HHG.  Copies of Matson rate guides for the shipments at issue are attached hereto

23   as Exhibit D.  The rate guides reflect and confirm Matson's expertise and

24   knowledge of the rules governing these shipments.  The rate guide issued in April,

25   2007, for example, states that it is for "household goods rates for IS07" and

26   provides "Matson's Hawaii service rates for Military Household Goods Summer

27   Cycle."  A May, 2008 Matson rate publication directs TSP to "[p]lease use the

28   following rate confirmation pages as you calculate your IW08 rates" referring to the

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   military HHG rate cycle for the Winter 2008 period.  The cover page to rates
2   published for IS05 notes for freight forwarder TSPs considering shipping with
3   Matson, that,  Matson's " schedule allows you to satisfy your military customers
4   . . . And best of all, you'll have peace of mind knowing your HHGs are in the
5   hands of a company with over 100 years of experience serving the Pacific."  The
6   forwarding notes from Matson representative John Rowan state "Aloha!  Matson is
7   committed to providing you, our valued household goods community and military
8   members, with the best service at competitive rates."  Matson rate guides
9   specifically note that the shipments will be subject to a fuel surcharge, and refer to
10  this surcharge alternatively as a "fuel surcharge," and "bunker fuel adjustment."

11      42.    Both Matson and Horizon have at times maintained internet websites
12  to provide information to freight forwarders about shipments of military HHG and
13  the related rules.  The precise dates on which Matson and Horizon have maintained
14  these websites are presently unknown.

15      43.    Matson and Horizon require the freight forwarder's port agent to
16  complete a manifest for each shipment.  The information required to complete the
17  manifests includes the Government Bill of Lading or GBL number, and the name
18  and location of the service person whose goods are being transported, among other
19  information.  Freight forwarder TSPs routinely received the GBLs when the
20  shipment was arranged, and sometimes provided copies of the GBLs to the Ocean
21  Carrier Defendants.  In the rate sheets included in Exhibits C and D, both Matson
22  and Horizon state that certain of the rates quoted are available only to shipments
23  moving by GBL.

24      44.    In order to provide freight forwarders with invoices they could use to
25  comply with the Rate Solicitation Item 432 and "separately" set forth on their
26  invoices to the government the "actual amount" of the fuel surcharge claimed as a
27  BSC as defined by Item 252 of the Rate Solicitation to be a charge "sometimes
28  added to ocean TSP rates" and " justified by higher fuel costs," the ocean carriers

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  had to separately set forth the bunker fuel surcharge (not the bunker surcharge plus

2  an unauthorized non-bunker surcharge) in their invoices to the freight forwarders.

3  Further, if the Ocean Carriers decided to charge a fuel surcharge on rail transport

4  that the SDDC did not allow and would not pay, or a fuel surcharge on truck

5  transport and fuel that the SDDC would pay only to the extent the price of fuel

6  exceeded a certain amount, the Ocean Carriers' bills were required to separately set

7  forth the amount of those fuel surcharges as well.  Freight forwarders likewise were

8  required when submitting bills to the SDDC not to include a surcharge for rail

9  transport, not to include a fuel surcharge for truck fuel except to the extent the fuel

10  cost exceeded a certain amount, and to provide or maintain invoices from ocean

11  carriers that separately set forth the actual amount of the bunker surcharge alone,

12  and if the ocean carrier billing them imposed a surcharge on rail transport, not to

13  include that surcharge in their bill to the SDDC.

14      45.    At least as early as January 1, 2007, beginning on a date that is

15  presently unknown, and continuing until mid-2012 for Matson, and mid-2013 for

16  Horizon – after Defendants learned of this lawsuit – the Defendants submitted and

17  caused to be submitted false and fraudulent claims to the SDDC, and made and

18  used false writings in support of those false claims.

19      46.    The Ocean Carrier Defendants prepared freight bills or invoices that

20  combined together a fuel surcharge for ocean transport – the actual bunker fuel

21  surcharge – with a fuel surcharge on the line haul portion of intermodal shipments.

22  The Ocean Carrier Defendants knowingly created, presented and caused to be

23  presented freight bills that included false and fraudulent fuel surcharges that were

24  inflated by the amount of the disallowed surcharge on line haul transport.

25  Moreover, the Ocean Carrier Defendants falsely and fraudulently labeled the fuel

26  surcharges on their invoices.  The Ocean Carrier Defendants did so knowingly;

27  intending to submit, and to cause to submit, false and fraudulent claims for

28  payment, and with reckless disregard of information, including the following:

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   freight forwarders routinely submitted claims to the SDDC for reimbursement for

2   the full amount of the fuel surcharges the carriers imposed; the freight forwarders

3   used the carriers' freight bills as support for those false and fraudulent claims; the

4   bills the Ocean Carrier Defendants provided to the freight forwarder TSPs

5   prevented the freight forwarder TSPs from determining the presence or amount of

6   the prohibited fuel surcharge and billing the SDDC for the authorized bunker

7   surcharge alone; and the Rate Solicitation and TR-12 prohibited a portion of the

8   fuel surcharges, including any fuel surcharge for transport by rail.  The Ocean

9   Carrier Defendants knowingly, and with deliberate ignorance or reckless disregard,

10  submitted false and fraudulent claims to freight forwarders, and caused the freight

11  forwarders to submit false and fraudulent claims to the SDDC.  The Ocean Carrier

12  Defendants submitted false and fraudulent claims for payment to freight forwarders,

13  knowing that their bills would be paid with funds spent and used on the

14  government's behalf.

15       47.    Cartwright knowingly submitted false and fraudulent claims to the

16  SDDC and false writings prepared by the Ocean Carrier Defendants that supported

17  the false claims.  Cartwright knew that the freight bills or invoices submitted to

18  them by the Ocean Carrier Defendants included inaccurately labeled fuel

19  surcharges and fuel surcharges on rail and other line haul transportation.  Other

20  freight forwarders were deceived by the Ocean Carriers' false and fraudulent bills

21  and the Ocean Carrier Defendants caused them to submit false and fraudulent

22  claims to the SDDC.

23       48.    Defendants Cartwright and Matson, and others unknown (the

24  "Conspiring Defendants"), conspired and agreed to submit false and fraudulent

25  claims, to create false writings in support of false and fraudulent claims to ensure

26  that the SDDC would accept all supplemental bills from Ocean Carrier Defendants,

27  including fuel surcharges that included a surcharge on overland or rail transport,

28

1    and to attempt to persuade other carriers not to comply with the requirements of the

2    Rate Solicitations and TR-12, at least as early as November 2006.

3        49.    The Defendants are sophisticated parties, well acquainted with the

4    SDDC rules, including the Rate Solicitation and TR-12.  They employ professional

5    staff, some of whom have job responsibilities that include serving the military HHG

6    trade and being familiar with the related rules and regulations.

7        50.    In late 2006 and early 2007, shortly before the time when revisions to

8    TR-12 were scheduled to go into effect, the Conspiring Defendants conferred about

9    how to deal with TR-12, and how to ensure that the ocean carriers could continue to

10   charge a fuel surcharge on rail transport, and freight forwarders, including

11   Cartwright, could continue to "pass through" to the SDDC the full surcharge

12   imposed, including the prohibited portion on rail transport.  In short, the Conspiring

13   Defendants conferred as to how to deceive the SDDC into paying the full amount

14   billed as a fuel surcharge, even when that fuel surcharge included unauthorized

15   components.

16       51.    The Conspiring Defendants were concerned about TR-12 and actions

17   by some industry members.  An ocean carrier named Trailer Bridge prepared bills

18   that complied with SDDC rules and separately identified a "bunker fuel surcharge,"

19   and an "intermodal fuel surcharge" on its shipments between CONUS and Puerto

20   Rico.  Further, Daycos, a company that provided and continues to provide billing

21   services for freight forwarders, announced that it would not treat fuel surcharges for

22   the overland portion of intermodal shipments as reimbursable by the SDDC; i.e.,

23   that it would not seek to "pass through" overland or line haul fuel surcharges to the

24   SDDC.  The Conspiring Defendants were concerned that how the carriers described

25   and set forth fuel surcharges on their freight bills might alert the SDDC to the fact

26   the Defendants were not complying with the Rate Solicitation, and that TR-12 and

27   some carriers' billings might jeopardize the Defendants' ability to bill and collect

28   from the government prohibited fuel surcharges for line haul shipments.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

52.     Representatives of the Defendants belonged to the "Carrier Relations Committee" of an industry trade group, called at that time the Household Goods Forwarders Association of America ("HHGFAA"). These representatives included Ken Selvey of Cartwright, John Rowan of Defendant Matson, and Ed Bertie of Defendant Horizon. How to deal with TR-12 and the actions of Daycos and Trailer Bridge were topics of communications between members of this committee in late 2006 and early 2007.

53.     In late 2006 or early 2007, on a precise date that is presently unknown, the Conspiring Defendants agreed that Matson would prepare invoices or freight bills that included a single fuel surcharge applied both to ocean freight – the only shipment actually subject to a bunker fuel surcharge – and to overland or line haul transportation. By combining the fuel surcharges under one label, the Conspiring Defendants sought to conceal the fact the surcharge was not in fact a bunker fuel surcharge and not fully reimbursable, and thereby defraud the government.

54.     The Conspiring Defendants further attempted to persuade other carriers to adopt a similar billing practice to conceal the illegal surcharges.

55.     In late November 2006, in anticipation of TR-12 becoming effective, Ken Selvey of Cartwright and John Rowan, a "Manager, National Accounts Household Goods" at Matson, corresponded about TR-12 and what steps Matson might take to deal with the prohibition in TR-12 related to fuel surcharges.

56.     In an e-mail, dated November 6, 2006, Selvey noted that the SDDC had begun to review and change its "views" regarding various items including "fuel surcharge[s]." Selvey described how Matson's bills could be revised in a manner that would deal with what Selvey described as the "problem" presented by the new SDDC policy. Selvey noted that on its current bills, "Matson refers to and bills their fuel surcharge as a fuel surcharge." Selvey observed that the SDDC Rate Solicitation "[a]llows for a past [sic] thru of 'Bunker fuel charges.'" Selvey suggested a solution to the problem posed by the new limits in TR-12 that were

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

about to go into effect: "To avoid problems down the road, is it possible for Matson to change and refer and bill the fuel [surcharge] as 'bunker fuel'?" In summary, Selvey proposed that Matson falsely and fraudulently label the fuel surcharge, including the portion for overland transport, as "bunker fuel," so that the fuel surcharge would appear to fit within the rules and deceive the SDDC.

57.    In an e-mail reply sent later the same day, Rowan reassured Selvey that Matson would falsely and fraudulently label fuel surcharges on its bills to ensure that the SDDC would pay the full surcharges, including the prohibited portion related to transport by rail. Rowan advised that Matson was already considering what to do to evade the limits in TR-12 (and preserve Matson's ability to use this device to increase revenue). Rowan wrote, "Hi Ken: When we received the review of Policy TR-12 after the official Federal Register filing, I began the process to change our nomenclature in regard to the fuel surcharge. To ensure SDDC will accept all supplemental bills from ITGBL carriers, Matson will have our line-item amended to read Bunker Fuel Surcharge long before the April 1, 2007 Implementation date."

58.    Selvey, on behalf of Cartwright and the other Conspiring Defendants, also communicated with Trailer Bridge, the carrier that was separately and accurately stating the bunker and line haul fuel surcharges on its bills in compliance with SDDC requirements. In approximately August 2007, Selvey asked Trailer Bridge to combine the bunker fuel surcharge with the intermodal fuel surcharge, and to falsely label the combined surcharge as a bunker fuel surcharge; i.e., to do precisely what Horizon was already doing and what Rowan had assured Selvey Matson would do "to ensure [that the] SDDC will accept all supplemental bills from ITGBL carriers. . . ." Trailer Bridge refused to do so, and communicated its refusal in an email to Selvey dated August 22, 2007.

59.    Horizon's billings already combined both the ocean or bunker fuel surcharge and the overland or rail surcharge, and specifically and falsely labeled the

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  combined surcharge as a "BS" or bunker surcharge.  There was no concern that

2  Horizon's method of billing and concealing the rail or line haul fuel surcharge

3  needed to be changed in order to avoid the SDDC detecting the disallowed

4  component of the false, fraudulent and inflated "BS" fuel surcharge.

5       60.  Matson's billings for intermodal shipments and how it labeled the

6  related fuel surcharge were again a matter of concern in the Summer of 2010.  In

7  approximately June 2010, Matson offered freight forwarders who were making

8  intermodal shipments the option of using "single-factor" through rates that included

9  both ocean and overland transport, or "multi-factor" rates where the ocean and

10  overland portions were subject to separately quoted rates.  Matson allowed freight

11  forwarders to choose either method of shipping.  At the same time, for multi-factor

12  shipments, Matson began to separately identify on its freight bills the fuel surcharge

13  on the ocean transport, and the fuel surcharge on the overland transport.  For

14  "single-factor" intermodal shipments, Matson continued to impose a single fuel

15  surcharge and did not disclose that the surcharge included a non-reimbursable

16  portion related to line haul transport.

17       61.  Matson assured the freight forwarder community that if a freight

18  forwarder elected to use the multi-factor option, Matson would falsely label any

19  fuel surcharge on the line-haul portion as a "bunker fuel surcharge," to make sure

20  the freight forwarder could pass through the fuel surcharge to the SDDC.  In a

21  communication to freight fowarders, Matson included the following "frequently

22  asked" question and answer:

23            Q:  [By a freight forwarder]  I need to pass-thru the Fuel
24            surcharge.  How will this appear on my Matson freight
          bill?

25            A:  [By Matson]  Fuel assessed on the ocean freight
26            portion will read: Fuel Related Surcharge.  Fuel assessed
          on the inland line-haul portion will read: Bunker Fuel
27            Surcharge.

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   62.   Matson began issuing new false and fraudulent freight bills consistent

2   with the above in approximately June 2010.  Matson's freight bills in this period

3   falsely and fraudulently labeled the line haul fuel surcharge as a "bunker fuel

4   surcharge."

5   63.   Less than three months later, Matson curtailed its new billing

6   practices.  Matson became concerned that the two different billing methods – and

7   the fact that for one form of service there was a single surcharge imposed that

8   included an undisclosed non-reimbursable component – might cause the SDDC to

9   discover the false and fraudulent nature of the Ocean Carrier Defendants' billings,

10   and again changed its billing practices.

11   64.   When it communicated this decision to freight forwarders in early

12   August 2010, Matson stated that the ocean or bunker and inland fuel surcharges on

13   its freight bills had been "inadvertently mislabeled," and that it was correcting a

14   purported mistake.  Matson, however did not correct how it labeled the fuel

15   surcharge on its freight bills for either the ocean transport or the inland line haul, or

16   make its billings accurate.   Instead of making its freight bills truthful and non-

17   fraudulent – by fixing the mistaken labels so the surcharge on ocean transport was

18   accurately described as a bunker surcharge and the surcharge on the inland or line

19   haul transport was correctly identified as a rail or line haul surcharge – Matson

20   returned to its prior fraudulent billing practice.  Specifically, Matson decided to

21   supposedly fix its "inadvertent mislabeling" not by correcting the labels, but instead

22   by again combining the two surcharges and again burying and concealing the inland

23   or line haul portion of any intermodal shipment where rail transport was used.

24   From August 15, 2010, until mid-2012, Matson again prepared and submitted false

25   and fraudulent freight bills that combined the two fuel surcharges into a single,

26   inflated, false and fraudulent surcharge.

27

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

### The False and Fraudulent Writings and Billings

65.     The Defendant Ocean Carriers, and each of them, knowingly created and presented false and fraudulent freight bills to freight forwarders, including Cartwright, in circumstances where the money was to be spent and used on the Government's behalf and the Government was to provide or had provided a portion of the money demanded.  The Defendant Ocean Carriers also created false freight bills to support their false and fraudulent claims to the freight forwarders.  The Ocean Carriers also caused freight forwarders to submit false and fraudulent claims to the SDDC, and created false writings to support those false and fraudulent claims.

66.     Freight forwarders, including Cartwright, submitted false and fraudulent claims to the SDDC and created and used false writings in support of those claims.

### Horizon's False and Fraudulent Claims and Freight Bills

67.     Beginning on a precise date that is present unknown, but at least as early as January 1, 2007 and continuing until approximately May, 2013, Horizon created and submitted to freight forwarders false and fraudulent freight bills, caused freight forwarders to submit false and fraudulent claims to the SDDC, and created false writings to support such false claims.

68.     A representative example of a false and fraudulent freight bill from Horizon is attached hereto as Exhibit E.  It is dated August 24, 2009 and includes a freight bill from Horizon to a freight forwarder (Bekins).  It concerns a shipment of HHG from Honolulu to Baltimore.  The page Bates numbered 303 sets out the charge from Horizon to the forwarder, Bekins.  It is false and fraudulent in numerous respects.

69.     The first line sets out the basic freight charge.  Here both the shipment and charge are falsely represented as "Ocean Freight," even though the goods were

1   actually transported by ship only from Honolulu to Tacoma, and then by rail from

2   Tacoma to Baltimore.

3       70.    The fuel surcharge appears on the next line.  It is falsely labeled as a

4   "BS Fuel Surcharge" and is applied to the misrepresented "Ocean Freight" charge,

5   including the unspecified portion of the freight charge due to the line haul transport,

6   at the rate of 28%.  "BS" means "bunker surcharge;" indeed the SDDC Rate

7   Solicitation itself abbreviates "bunker fuel surcharge" as "BSC."  As the fuel

8   surcharge here includes a fuel surcharge on the rail transport – and train fuel is not

9   bunker fuel – this label in the bill is false and fraudulent.  By labeling the fuel

10  surcharge as a "BS" or bunker surcharge, Horizon is falsely and fraudulently

11  representing that the surcharge imposed is a "bunker" surcharge, when it is not.

12      71.    The amount of the purported "BS" surcharge is also false and

13  fraudulent as it is inflated.  It is not the amount of a true or actual bunker fuel

14  surcharge; instead it includes a portion that is disallowed, and the entirety of the

15  amount is not a bunker surcharge.

16      72.    The single, consolidated fuel surcharge is false and fraudulent because

17  the true or actual bunker surcharge is not set forth and also is not separately stated.

18  The Rate Solicitation required that the freight bills set forth the "actual amount" of

19  the bunker fuel surcharge (not a bunker fuel surcharge plus a disallowed rail fuel

20  surcharge) and that the bunker fuel surcharge be set forth "separately" (and not

21  combined with another surcharge).

22      73.    The bill is false and fraudulent as it was made and forwarded to the

23  freight forwarder as part of a scheme to defraud the SDDC.  As reflected on the first

24  page of the bill, Horizon knew that this shipment was for "DOD SPONSORED

25  HOUSEHOLD GOODS AND PERSONAL EFFECTS," and that its bill would be

26  provided to the SDDC as supporting documentation along with the GBL, and that it

27  would be interpreted and understood in light of the related rules and requirements.

28  Horizon also knew and intended that freight forwarders would "pass through" the

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   full amount of the false and inflated fuel surcharge, and use and rely upon

2   Horizon's bill in support of false and fraudulent claims to the SDDC.  The bill was

3   designed and intended to deceive the SDDC and government personnel who might

4   review it with these requirements in mind, and freight forwarders who were not

5   aware the fuel surcharge was inflated and not reimbursable, and was false and

6   fraudulent.

7          74.    The bill is false and fraudulent in that the amount of the fuel surcharge

8   attributable to the overland or line haul portion of the shipment is not set forth and

9   cannot be determined from the bill.  The bill was not only designed to conceal the

10  disallowed portion of the fuel surcharge from the SDDC; freight forwarders

11  receiving and reviewing the bill also could not determine from it what portion of

12  the surcharge was disallowed.  If a freight forwarder wanted to be sure to comply

13  with the Rate Solicitation and TR-12, and to subtract any portion of the surcharge

14  that was prohibited, Horizon prevented the freight forwarder from doing so and

15  thereby caused the freight forwarder to submit a false and inflated bill to the SDDC.

16  Horizon caused even innocent freight forwarders to present false and fraudulent

17  claims to the SDDC.  Moreover, the absence of the data needed to determine what

18  portion of the surcharge was on the line haul portion made the billing false and

19  fraudulent because the absence of that data conveyed that that entire surcharge was

20  proper.

21          75.    The false and fraudulent character of Horizon's freight bills for

22  intermodal shipments of military HHG to or from Hawaii and Guam is also clear in

23  view of Horizon's billings for similar shipments between CONUS and Puerto Rico.

24  For intermodal shipments of military HHG to and from Puerto Rico, a route where

25  Matson did not have ships and no agreement was in place to inflate the purported

26  bunker surcharge, Horizon separately set forth on its freight bills a true bunker fuel

27  surcharge for ocean transport, and an "intermodal fuel surcharge."  That Horizon

28  did so for shipments to and from Puerto Rico demonstrates that Horizon understood

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO