1    GOODIN, MACBRIDE, SQUERI,
     DAY & LAMPREY, LLP
2    Wayne T. Lamprey, Bar No. 095408
          wlamprey@goodinmacbride.com
3    Anne Hayes Hartman, Bar No. 184556
          ahartman@goodinmacbride.com
4    505 Sansome Street, Suite 900
     San Francisco, California  94111
5    Telephone:   (415) 392-7900
     Facsimile:   (415) 398-4321
6
     Attorneys for Plaintiff-Relator
7    Mario Rizzo

8
                    UNITED STATES DISTRICT COURT
9
                  CENTRAL DISTRICT OF CALIFORNIA
10

11
     UNITED STATES OF AMERICA *ex*        Case No. 2:10-CV-07409-PA-AJW
12   *rel.* Mario RIZZO,
                                          **[PROPOSED]THIRD AMENDED
13                Plaintiff,              COMPLAINT FOR VIOLATIONS
                                          OF THE FALSE CLAIMS ACT**
14   v.
                                          **JURY TRIAL DEMANDED**
15   HORIZON LINES, LLC, a Delaware
     Limited Liability Company; and,
16   MATSON NAVIGATION
     COMPANY, INC., a Hawaii
17   Corporation,

18                Defendants.

19

20

21

22

23

24

25

26

27

28

     **Case No. 2:10-CV-07409-PA-AJW**              **THIRD AMENDED COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................. 1

PARTIES ............................................................................................... 3

JURISDICTION AND VENUE ............................................................. 4

ALLEGATIONS COMMON TO ALL CLAIMS ................................... 4

    The Shipments Involved ................................................................. 4

    The Governing Rules:  SDDC "Rate Solicitations" and "TR-12" ................. 7

    Defendants' Fuel Surcharges and Freight Bills to Freight Forwarders ........ 11

    Horizon Freight Bills ................................................................... 14

    Matson Freight Bills .................................................................... 17

    Defendants Caused Freight Forwarders and Billing Agents to Present
    False and Fraudulent Claims to the SDDC ..................................... 18

    Defendants Acted Knowingly ....................................................... 25

    Identifying the Claims at Issue ...................................................... 31

CLAIMS FOR RELIEF ...................................................................... 35

    Count 1 ....................................................................................... 35

        Submitting False Claims in Violation of the False Claims Act,
        31 U.S.C. section 3729(a)(1)(A) .............................................. 35

    Count 2 ....................................................................................... 35

        Making False Records Material to a False or Fraudulent Claim
        in Violation of the False Claims Act, 31 U.S.C. section
        3729(a)(1)(B) ........................................................................ 35

RELIEF REQUESTED ....................................................................... 36

CLAIM OF RIGHT FOR TRIAL BY JURY ...................................... 37

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Plaintiff Mario Rizzo, in his capacity as a Relator ("Relator"), files this Third Amended Complaint against defendants and alleges as follows:

## INTRODUCTION

1.     This action is brought on behalf of the United States pursuant to the False Claims Act, 31 U.S.C. sections 3729, et seq. (hereinafter "the Act"), and pursuant to the provisions of the Act which allow individuals with knowledge of violations of the Act to file suit on behalf of the government.  Before this action was filed by Relator, the violations of the Act alleged herein were never publicly disclosed.

2.     This lawsuit arises out of a long running scheme by the defendant ocean shipping companies – Horizon Lines, LLC and Matson Navigation Company, Inc. – to defraud the United States armed services in connection with the shipment of household goods for military personnel in the Army, Navy, Air Force, Marines, and Coast Guard ("military HHG" or "HHG").  Defendants, ocean carriers, included on their bills a prohibited fuel surcharge on shipments by rail ("rail surcharge"), but combined that rail surcharge with an allowed surcharge for fuel used by ships, "bunker" fuel.  Freight forwarders who contracted with the federal government and subcontracted with Defendants, received the Defendants' freight bills, and then – as the Defendants intended – "passed through" to the government the full amount of the purported bunker surcharge including the prohibited rail surcharge.  Defendants acted knowingly, aware that the rail surcharge was disallowed and that freight forwarders would pass the hidden rail surcharge through, allowing the Defendants to obtain additional monies from the Department of Defense.  As a result, the United States was overcharged and unwittingly paid tens of millions of dollars in prohibited surcharges, which funds ended up with the Defendants.

3.     The military HHG shipments involved were between Hawaii or Guam, on the one hand, and points in the continental United States ("CONUS") on the

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

other hand, where the CONUS point of origin or destination is not on the west coast (the "Subject Shipments").  Freight forwarders contract with the Surface Deployment and Distribution Command ("SDDC") of the Department of Defense ("DoD") to provide door-to-door transportation for the Subject Shipments, and in turn contract with others to provide the freight service.  The Subject Shipments were transported by ship between Hawaii or Guam and ports on the west coast of the United States, and to or from there by rail (or infrequently by truck) to other locations in CONUS.  Shipments of this type are referred to as "intermodal" shipments, requiring two types or modes of transport:  ocean transportation by ship, and inland or "line haul" transport by train or truck.

4.      Rate Solicitations issued by the SDDC for these types of shipments provide that the SDDC will, subject to certain conditions, reimburse freight forwarders for so-called "bunker fuel surcharges" imposed on them by ocean carriers to account for changes in the cost of a type of fuel used only by ships – bunker fuel.  The SDDC, however, expressly prohibits all fuel surcharges for "any type of rail shipment," limits fuel surcharges on truck transportation, and specifies that these prohibitions apply to the overland or "domestic line haul portion" of the Subject Shipments.

5.      Despite this clear prohibition, the defendant ocean carriers included in the freight bills they submitted to freight forwarders for the Subject Shipments fuel surcharges on the rail or line haul portion of the shipments.  The prohibited fuel surcharges, however, were concealed and falsely labeled.  The defendants' bills included a single purported bunker fuel surcharge which had been inflated to encompass a surcharge on the rail or line haul portion of the transport.  There was no legitimate business purpose for the defendants to prepare their freight bills in this fashion.  They designed their bills, and chose the labels they used, to cause the freight forwarders to overcharge the SDDC, and to themselves receive the prohibited surcharge funds.

6.     The defendants were successful in concealing the prohibited fuel surcharges:  the freight forwarders, unaware of the true nature of the carriers' fuel surcharges, paid them and then sought reimbursement from the government, falsely claiming that the fuel surcharges billed by the carriers were bunker surcharges authorized by SDDC rules.  Deceived by the defendants' billings, and unaware that the fuel surcharges on defendants' bills were inflated and included a disallowed surcharge, the SDDC paid them in full.

7.     The defendants, as described with greater particularity below, caused to be presented false and fraudulent claims for payment to the SDDC; presented false and fraudulent claims to the freight forwarders; and made, used and caused to be made and used, false and fraudulent records and statements material to false claims, in violation of the False Claims Act.

## **PARTIES**

8.     Relator is an individual and a resident of Illinois.  He has over 30 years of experience in the shipping industry, and has held executive positions in international and domestic shipping of commercial, military and government household goods, including positions with freight forwarders and an ocean carrier. He has served in various industry groups, including as chair of the Carrier Relations Committee of the Household Goods Forwarders Association of America (now known as the International Association of Movers), and on the board of the International Shippers Association.  Through his professional experience and activities in the industry, Relator has personal knowledge of the practices and procedures of ocean carriers and freight forwarders with respect to the Subject Shipments.

9.     Plaintiff United States of America is acting on behalf of the Department of Defense ("DoD"), Surface Deployment and Distribution Command ("SDDC"), formerly known as Military Traffic Management Command, a command of the United States Transportation Command, serving the Army, Navy,

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   Air Force, Marines, and Coast Guard.  During the relevant time period, SDDC had

2   its headquarters in Alexandria, Virginia and at Scott Air Force Base, Illinois.

3       10.   Defendant Horizon Lines, LLC ("Horizon"), is a limited liability

4   corporation organized and operating under the laws of the State of Delaware with

5   its principal place of business in Charlotte, North Carolina.

6       11.   Defendant Matson Navigation Company, Inc. ("Matson"), is a

7   corporation organized and operating under the laws of the State of Hawaii with its

8   principal place of business in Oakland, California.

9       12.   Defendants Horizon and  Matson are referred to herein collectively as

10  "Defendants," or "Carriers."

## JURISDICTION AND VENUE

12      13.   This court has jurisdiction over the subject matter of this action

13  pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 31 U.S.C. § 3732

14  (federal court jurisdiction for actions brought pursuant to 31 U.S.C. § 3730).

15      14.   Venue is proper in this district pursuant to 31 U.S.C. § 3732(a),

16  because Defendants transact business, including shipping goods through this

17  District as alleged in this complaint, and under 28 U.S.C. 1391(b) and 1395(a).

## ALLEGATIONS COMMON TO ALL CLAIMS
### The Shipments Involved

20      15.   The DoD, through the U.S. Transportation Command, and its

21  subordinate military command, SDDC, contracts for the transportation of

22  household goods belonging to servicemen and servicewomen when they are

23  relocated.  The items transported are commonly referred to as either "military

24  HHG," or "Defense Personal Property."  This lawsuit concerns shipments of

25  military HHG between, on the one hand, Hawaii or Guam, and, on the other hand,

26  the continental United States ("CONUS").  Such shipments fall within the DOD

27  definition of "international shipments."

28

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

16.     More specifically, this lawsuit concerns international shipments of HHG where the transport involves both ocean transport by ship, and long-distance transport over land within CONUS by rail or truck.  For example, to move a soldier from Schofield Barracks in Oahu to Fort Benning, Georgia, would require: (1) local Hawaii moving and storage companies to pack the HHG into wooden crates called "liftvans" at the soldier's home, and transport those to the port in Honolulu, (2) Honolulu port agent services, (3) ocean transport services, (4) mainland port agent services, and (5) overland transport by rail or truck to get the freight over land to the soldier's new home in Fort Benning in western Georgia.  Shipments of this sort are referred to in the shipping industry as "intermodal" shipments; i.e. shipments that require multiple modes of transport – ocean transport by ship, and overland or line haul transport generally by rail (or less frequently by truck).

17.     Freight forwarders contract with the SDDC to manage the move from door to door.  During the relevant time period, there were approximately 200 different freight forwarders who billed the SDDC for the Subject Shipments.  It is the freight forwarders who arrange for each of the steps outlined above, contracting with others as needed.  Among those the freight forwarders contract with are ocean carriers, such as Defendants.  Ocean carriers are typically responsible for moving the liftvans with the HHG from the port or rail yard of origination to a port or rail yard near the ultimate destination.

18.     Defendants both operate ships that move military HHG between Hawaii and/or Guam and ports on the west coast of the United States.  All such transport must be performed by "Jones Act" carriers, those meeting the requirements of the Jones Act, 46 U.S.C. § 101 et seq.  Defendants each operate "Jones Act" fleets, and collectively handle in excess of 90% of the Jones Act freight between CONUS and Hawaii and 100% of the Jones Act freight between CONUS and Guam.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19.     Because Defendants' ships call only on west coast ports, for intermodal shipments where the CONUS point of origination or destination is not in the western United States, Defendants contract with others to transport the military HHG over land to or from a point that is near the destination or point of origin. This inland, east coast, or gulf coast delivery or pick-up point is typically a rail ramp terminal or yard, where military HHG can be loaded or unloaded for local service providers, who will handle the final or originating local leg to or from the service member's local residence.  In this way, Defendants could book the hypothetical Hawaii-to-Georgia move by providing freight from Honolulu to the port/rail ramps in Jacksonville, Florida or Charleston, South Carolina, even though they do not have any ships that go to those ports.  Defendants receive and pay bills from the railroads or trucking companies for this overland transportation.

20.     The SDDC issues a Government Bill of Lading ("GBL"), also sometimes referred to as a Personal Property Government Bill of Lading ("PPGBL") when the shipment is arranged.  When the shipment is complete, the freight forwarder, or a billing agent for the freight forwarder, bills the SDDC for the entire shipment, submitting the completed GBL with required supporting documentation, including bills or invoices submitted to the freight forwarders by the Defendants.   When submitting the GBL, freight forwarders or their agents (referred to collectively herein as "freight forwarders" or "forwarders") certify that the charges included are accurate and comply with related requirements.  Attached as Exhibit A are examples of GBLs for some Subject Shipments submitted by or on behalf of a freight forwarder, Cartwright International Van Lines, Inc., to the SDDC.  At certain times, Cartwright engaged the largest billing agent in the United States, Daycos, to submit its GBLs, often after auditing them.  For this reason, on certain GBLs in Exhibit A, Daycos is the signatory.

21.     The Defendants are fully aware that the Subject Shipments are for the DoD, know the related rules and requirements, including what are allowed

surcharges and what are not, and know that in order to be paid for any surcharges the freight forwarders are required to and do prepare GBLs that match and are supported by bills from the Defendants.  Although the Defendants' invoices to the freight forwarders for intermodal shipments encompass the overland transport segment, for the Subject Shipments, the Defendants do not set forth a separate charge for the rail or line haul transport, do not set forth a separate fuel surcharge for the rail or line haul transport, and do not forward the billings from the railroads or trucking companies to the freight forwarders.  Since approximately 2010, the freight forwarders have submitted their bills electronically and have retained the invoices from the Defendants for potential inspection by the SDDC.

22.     Both freight forwarders and ocean carriers are referred to as "Transportation Service Providers" or "TSPs."  Freight forwarders shipping military HHGs are also referred to as "ITGBL transportation service providers," in reference to the "International Through Government Bills of Lading" pursuant to which they provide service, and ocean carriers are also referred to as "ocean transportation service providers."

**The Governing Rules:  SDDC "Rate Solicitations" and "TR-12"**

23.     The Subject Shipments and billings at issue are controlled by "International Personal Property Rate Solicitations" issued periodically by the SDDC.   Relevant chapters of Rate Solicitation I-25, issued May 10, 2010, are attached as Exhibit B.  As the Rate Solicitation itself states, it "provides guidelines, rules, regulations and other information required to participate in the movement of personal property worldwide."  (Exh. B, Item 100, Bates p. 13)  Exhibit B is representative of the Rate Solicitations issued by the SDDC throughout the period at issue. (The Rate Solicitation preceding Exhibit B was I-24; the following was I-26.  The Solicitations were renamed as "Defense Personal Property Program International Tenders" in 2011.  The relevant Solicitations and Tenders are referred to herein as "Rate Solicitation.")

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

24.     The Rate Solicitation sets forth the terms and conditions governing different types of transportation services, referred to as "Codes of Service."  (Exh. B, Item 407, "Description of Codes of Service," Bates p. 42)  The service involved in this lawsuit is "Code 4 – International Door-to-Door Container," defined as the "Movement of HHG in containers whereby a Transportation Service Provider provides completely through service from origin residence to the destination residence over land and/or ocean means."  (Id.)

25.     Freight forwarders submit bids in response to the Rate Solicitation setting forth the rates that they will charge the SDDC during the time period governed by the Solicitation (the "rate cycle").[1]  The path between each possible origin and destination point is referred to as a "channel," and freight forwarders bid for each channel they are interested in serving.  The freight forwarder rates for Code 4 "door-to-door" service in each channel are commonly known as "through rates" or "single-factor rates" ("SFR").  In each rate cycle, transportation offices at military installations book shipments in each channel with the low bid freight forwarder for that channel, or other freight forwarders who agree to match those rates or have a comparable or better "best value" score.

26.     In advance of each rate cycle, Defendants create and publish rates for ocean and intermodal transportation specifically for military HHG shipments. Defendants create and publish these rates knowing that the freight forwarders will use them to prepare their bids to the SDDC for the upcoming rate cycle, and knowing that service will be provided pursuant to SDDC rules.

27.     A rate that is established by this bidding process is required to cover every aspect of the shipment, including fuel costs.  The Rate Solicitation, however, allows for the possibility that the freight forwarder TSPs may be required to pay

---

[1] Until 2011, each international rate cycle was six months long, with a "summer" period, referred to as International Summer [Year], or IS-[Year] and a "winter" period, referred to as IW-[Year]. With the rate cycle beginning May, 2011, the Defense Personal Property Program International Tender covered a 12 month rate cycle, each referred to as IT-[Year].

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

other TSPs they contract with, such as the Defendants, higher amounts than anticipated when the through rate was fixed. The Rate Solicitation permits freight forwarder TSPs to pass on some of these unanticipated costs in the form of "surcharges," also known as "accessorial charges" and "supplemental bills." Item 432 of the Rate Solicitation spells out that some unusual or variable costs associated with land, water and air transportation are not covered by the single factor rate. This is done so that the TSPs do not need to increase their rates to account for the possibility that these circumstances will arise (which would result in inflated rates and bids). The ocean carriers and freight forwarders instead are able to recoup these costs as allowed "surcharges," when justified. The Rate Solicitation defines a "surcharge," as "[a]n extra fee, levied to a shipment, paid by the transportation service provider and sometimes reimbursed by the U.S. Government." (Exh. B, Item 252, Bates p. 23)

28.     Five and only five surcharges are allowed and they are set out in Item 252 of the Rate Solicitation. The surcharge at issue here is the "Bunker Surcharge," which the Rate Solicitation defines as follows:

> Bunker Surcharge (BSC) – An extra charge, also known as Bunker Adjustment Factor (BAF) or Fuel Adjustment Factor (FAF), sometimes added to ocean TSP rates. This surcharge is justified by higher fuel costs. This surcharge is applicable to codes of service 1, 2, 3, 4, and 7.

(Exh. B, Item 252, Bates p. 23) The bunker surcharge is so named because of the type of fuel used by ships: "bunker fuel." Bunker fuel is not used in any other transportation application, and any reference to "bunker fuel," "bunker surcharges," or "bunker adjustments" is, by definition, a reference to transport by ship only.

29.     Bunker fuel surcharges can be substantial. Ocean carriers began to impose them in the 1990's and at that time the purported justification was to meet the higher cost of the bunker fuel used by ships. Initially the surcharge was small – less than 5% of the total bill. Over time, however, the Defendants have repeatedly

1   increased the purported bunker surcharge to levels in excess of 33% of the entire

2   bill, with only occasional deviations downward.

3        30.   The same section of the Rate Solicitation that allows for five types of

4   surcharges, Item 432, also includes requirements designed to prevent fraud and

5   abuse; rules the Carriers' bills circumvented.  In order to be reimbursed for an

6   allowed bunker surcharge, a freight forwarder must have actually incurred a bunker

7   surcharge for the same amount, and received a bill from the ocean carrier involved

8   that supports its claim for reimbursement.  In order to "pass through" a bunker

9   surcharge, a freight forwarder must present along with the GBL, a freight bill from

10  the ocean carrier that includes a fuel surcharge that matches the surcharge on the

11  GBL.  Item 432 states that the a permitted surcharge, including a bunker surcharge,

12  can be billed to the government only "[w]hen actually billed to the ITGBL

13  Transportation Service Provider [the freight forwarder] by ocean freight

14  Transportation Service Provider, air Transportation Service provider, or port

15  agent."  (Exh. B, Bates p. 71)  Further, Item 432 requires that, "[s]uch charges will

16  be separately stated on the GBL and supported by prorated ocean, air

17  Transportation Service Provider or port agent invoices for the actual amount."  (Id.)

18  In short, the SDDC will only pay a bunker fuel surcharge if the ocean carrier TSP

19  provides the freight forwarder TSP with a bill stating the "actual amount" of the

20  bunker surcharge (not the bunker surcharge plus some other unauthorized charge),

21  and the freight forwarder has this bill from the ocean carrier to support its own

22  invoice to the SDDC.

23       31.   With respect to overland transportation of HHG, the SDDC will not

24  pay any fuel surcharge whatsoever for transport by rail, and will pay a fuel

25  surcharge for transport by truck only if the price for diesel exceeds a certain

26  benchmark.  Item 432 of the Rate Solicitation directs parties to:  "See Item 513 for

27  application of the Fuel Surcharge for CONUS line haul, including Alaska and

28  Hawaii."  Item 513 allows for a fuel surcharge on inland transportation but it

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

"appli[ies] only to any inland transportation segment within CONUS where a Fuel Surcharge applies to that segment of a shipment transported by truck."  (Exh. B, Item 513, Bates p. 113)  Item 513 only permits fuel surcharges for inland transport by truck, and refers to the SDDC's "Fuel-Related Adjustment Policy No. TR-12" ("TR-12") (Attached as Exhibit C).  Complementing Item 513 – which only permits a fuel surcharge on inland transport by truck – TR-12 expressly prohibits any fuel surcharge on inland transport by rail.  (Exh. C at ¶ 1.a)

32.    Consistent with Item 513 and the reference to it in the Rate Solicitation, TR-12 itself expressly states that it applies to "the domestic line haul portion of international movements" and "the line haul portion of domestic interstate and intrastate movements including Alaska and Hawaii."  (Exh. C at ¶2) TR-12 makes crystal clear the absolute prohibition on any fuel surcharge related to transport by rail, including rail shipments that are part of intermodal shipments. Effective as of April 1, 2007, it was revised to state that the SDDC will not: "pay an FRA [fuel-related adjustment] for any type of rail shipment."  (Exh. C, ¶1.a)  With respect to truck transportation, TR-12 only authorizes fuel surcharges if and to the extent that diesel fuel costs exceed a specific baseline.

**Defendants' Fuel Surcharges and Freight Bills to Freight Forwarders**

33.    Defendants Horizon and Matson each published their rates and terms for the shipment of military HHG throughout the relevant time period, revising the rates for each rate cycle.  As described above, because the freight forwarders based the rates they bid to the government for each rate cycle on the ocean carriers' freight rates, the freight forwarders would not accept increases in the ocean carriers rates in the middle of a military rate cycle, and during the relevant time period, the ocean carriers did not change base freight rates on the Subject Shipments in the middle of a rate cycle.  The only way the Defendants could increase their revenues for the Subject Shipments during a rate cycle was by increasing the purported bunker fuel surcharges (or other authorized surcharges) they imposed.  Freight

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   forwarders, the Defendants knew, would object to the Defendants imposing any

2   fuel surcharges the forwarders could not pass through to the government, and the

3   Defendants would lose customers and business if they did so.

4        34.    Horizon's rates were set forth in  "Household Goods Rate Guide[s]" in

5   advance of each military HHG rate cycle.  Copies of representative Rate Guides

6   issued by Horizon are attached as Exhibit D.  The Rate Guides confirm Horizon's

7   related knowledge and expertise.  Horizon's Rate Guide for "Military's Year 2007

8   Winter Cycle," for example, states:

9        This guide provides household goods shippers with ocean
         rates for the Military's Year 2007 Winter Cycle.  The
10       rates have been forward filed in their respective tariffs so
         that military household carriers can be aware of ocean
11       costs before filing their through rates with the
         government.
12
         Please be advised that all assessorial charges, such as
13       wharfage, fuel, security, etc. are subject to change at any
         time.
14

15       35.    Matson also issued rate guides specifically for the shipment of military

16   HHG.  Copies of Matson rate guides for the shipments at issue are attached hereto

17   as Exhibit E.  The rate guides reflect and confirm Matson's expertise and

18   knowledge of the rules governing these shipments.  The rate guide issued in April,

19   2007, for example, states that it is for "household goods rates for IS07" and

20   provides "Matson's Hawaii service rates for Military Household Goods Summer

21   Cycle."  A May, 2008 Matson rate publication directs TSP to "[p]lease use the

22   following rate confirmation pages as you calculate your IW08 rates" referring to the

23   military HHG rate cycle for the Winter 2008 period.  The cover page to rates

24   published for IS05 notes for freight forwarder TSPs considering shipping with

25   Matson, that,  Matson's " schedule allows you to satisfy your military customers

26   . . .  And best of all, you'll have peace of mind knowing your HHGs are in the

27   hands of a company with over 100 years of experience serving the Pacific."  The

28   forwarding notes from Matson representative John Rowan state "Aloha!  Matson is

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

committed to providing you, our valued household goods community and military members, with the best service at competitive rates." Matson rate guides specifically note that the shipments will be subject to a fuel surcharge, and refer to this surcharge alternatively as a "fuel surcharge," and "bunker fuel adjustment."

36.     Both Matson and Horizon have at times maintained internet websites to provide information to freight forwarders about shipments of military HHG and the related rules. The precise dates on which Matson and Horizon have maintained these websites are presently unknown.

37.     Matson and Horizon require the freight forwarder's port agent to complete a manifest for each shipment. The information required to complete the manifest includes the GBL number – a number unique to each shipment – and the name and location of the service person whose goods are being transported, among other information. Freight forwarder TSPs routinely receive the GBLs when the shipment is arranged, and sometimes provide copies of the GBLs to the Carriers. In the rate sheets included in Exhibits D and E, both Matson and Horizon state that certain of the rates quoted are available only to shipments moving by GBL.

38.     In order to provide freight forwarders with invoices they could use to comply with the Rate Solicitation Item 432 and "separately" set forth on their invoices to the government the "actual amount" of the claimed bunker surcharge, the Carriers had to separately set forth the bunker fuel surcharge (not the bunker surcharge plus an unauthorized non-bunker surcharge) on their invoices to the freight forwarders.

39.     At least as early as January 1, 2007, beginning on a date that is presently unknown, and continuing until mid-2012 for Matson, and mid-2013 for Horizon – after Defendants learned of this lawsuit – the Defendants caused freight forwarders and their billing agents to submit false and fraudulent claims to the SDDC, and made and supplied false writings in support of those false claims.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

40.     Defendants prepared freight bills that combined together a fuel surcharge for ocean transport – the actual bunker fuel surcharge – with a fuel surcharge on the line haul portion of intermodal shipments.  Defendants knowingly caused the forwarders to present to the SDDC, bills that included purported bunker fuel surcharges that were inflated by the amount of the disallowed surcharge on line haul transport, and to falsely certify that the invoice and fuel surcharge complied with SDDC rules and regulations.  Defendants' freight bills circumvented the rules in the Rate Solicitation that were intended to deter fraud and abuse.  Defendants caused the submission of false claims not only by creating freight bills that were required for a forwarder to overcharge the government, and thereby assisted and caused the submission of false claims, the Defendants also prevented forwarders from preparing accurate and non-fraudulent GBLs.

### Horizon Freight Bills

41.     Beginning on a precise date that is presently unknown, but at least as early as January 1, 2007 and continuing until approximately May, 2013, Horizon created and submitted to freight forwarders freight bills that caused freight forwarders to submit false and fraudulent claims to the SDDC, and created false and fraudulent writings to support such false claims.

42.     Examples of freight bills from Horizon are attached hereto as Exhibit F.

43.     A Horizon freight bill dated September 4, 2007, at page 6 of Exhibit F, is directed from Horizon to a freight forwarder, Cartwright International Van Lines ("Cartwright").  It concerns a shipment of HHG from Guam to Norfolk, Virginia.  On the first page, the item involved is described as "10 LIFT VAN DOD SPONSORED MILITARY HOUSEHOLD GOODS."  The freight bill sets out the charges to the forwarder.  The first line sets out the basic "Ocean Freight" charge.  The fuel surcharge appears on the next line.  It is falsely labeled as a "BS BUNKER SURCHARGE."   The amount of the "BS BUNKER SURCHARGE" is $1,323.10.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   How this amount was determined is not set forth.  Nor does the freight bill state that

2   any portion of the "BUNKER SURCHARGE" is actually not a bunker surcharge.

3   The bill also does not include information from which one could determine what

4   portion of the fuel surcharge is a rail or truck surcharge.  The September 4, 2007

5   freight bill is representative of  the thousands of freight bills Horizon prepared and

6   presented to freight forwarders and their billing agents until a date in 2009.

7        44.   A Horizon freight bill dated April 6, 2010, at Page 15 of Exhibit F, is

8   also directed from Horizon to Cartwright.  It concerns a Subject Shipment of HHG

9   from Guam to Houston, Texas.  On the first page, the item involved is described as

10   "3 PIECES DOD SPONSORED USED MIL HHGDS."  The first page sets out the

11   charges to the forwarder.  The first line sets out the basic "Ocean Freight" charge.

12   The fuel surcharge appears four lines below.  It is falsely labeled as a "BS Fuel

13   Surcharge."  The amount of the "BS Fuel Surcharge" is $453.24.  How this amount

14   was determined is not set forth.  Nor does the freight bill state that any portion of

15   the "BS Fuel Surcharge" is actually not a bunker surcharge.  The bill also does not

16   include information from which one could determine what portion of the fuel

17   surcharge is a rail or truck surcharge, or what portion of the surcharge is in fact a

18   bunker surcharge.  The April 6, 2010 freight bill is representative of the thousands

19   of freight bills Horizon prepared and presented to freight forwarders and their

20   billing agents beginning at a date in 2009 and until a date in 2012.

21        45.   As reflected in Exhibit F and as noted above, sometime in

22   approximately 2009, Horizon changed how it labeled the fuel surcharge from "BS

23   BUNKER SURCHARGE" to "BS Fuel Surcharge."  "BS" is an abbreviation for

24   bunker surcharge.  Horizon itself used "BS" as an abbreviation for bunker

25   surcharge on thousands of freight bills since at least 2004.  The SDDC Rate

26   Solicitation abbreviates bunker surcharge "BSC."  There is no type of fuel

27   surcharge other than a bunker surcharge that is abbreviated "BS."  When Horizon

28   changed the label it used for the fuel surcharge, Horizon knew and intended that the

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  phrase "BS Fuel Surcharge" would be understood as a bunker fuel surcharge, and

2  did not communicate to freight forwarders, their agents or the SDDC that "BS" now

3  meant anything other than what it had meant on thousands of preceding freight

4  bills, that is, a bunker surcharge.

5       46.    A Horizon freight bill dated June 10, 2012 is at page 18 of Exhibit F.

6  It is also directed to Cartwright, and concerns a shipment of HHG from Hawaii to

7  Portsmouth.  This is the form of freight bill Horizon began to use after it became

8  aware of this lawsuit.  On the second page, the item involved is described as "1

9  PIECES OF 1 MIL HHGS HOOVER, JOHN USA MLNQ034319."  The second

10  page sets out the charges to the forwarder.  The first line sets out the basic "Ocean

11  Freight" charge .  The fuel surcharges appear two and three lines down.  On this

12  freight bill, Horizon separately sets out an intermodal fuel surcharge and a bunker

13  fuel surcharge.  The bill also includes the actual amount of these two separate

14  surcharges.  The bunker surcharge is still labeled as a "BS" surcharge.  The first

15  fuel surcharge is labeled "IF INTERMODAL FUEL SURCHARGE 45.5%."  The

16  second fuel surcharge is labeled "BS FUEL ADJUSTMENT FACTOR 45.5%."

17  The June 10, 2012 freight bill is representative of  the freight bills Horizon prepared

18  and presented to freight forwarders and their billing agents after Horizon became

19  aware of this lawsuit and decided no longer to hide the intermodal fuel surcharge

20  and no longer to inflate the bunker fuel surcharge by the amount of the intermodal

21  surcharge (although, as set forth in more detail below, Horizon later stopped

22  imposing an intermodal fuel surcharge, presumably because the freight forwarders

23  objected that they could not pass through such a charge to the SDDC and were not

24  willing to pay the charge to Horizon unless they could pass it through).

25       47.    Horizon prepared and presented freight bills for the Subject Shipments

26  that falsely and fraudulently described the fuel surcharge as a bunker surcharge; did

27  not set forth the actual amount of the bunker surcharge; did not separately set forth

28  the bunker surcharge; did not set forth the amount of the prohibited surcharge

included with the purported bunker surcharge; and did not include the information required to calculate or deduct the amount of the included prohibited surcharge.

**Matson Freight Bills**

48.     Beginning on a precise date that is presently unknown, but at least as early as January 1, 2007 and continuing until approximately May, 2012, Matson created and submitted to freight forwarders freight bills that caused freight forwarders and their agents to submit false and fraudulent claims to the SDDC, and created false and fraudulent writings to support such false claims.

49.     Representative Matson freight bills for Subject Shipments are attached as Exhibit G.

50.     A freight bill dated November 20, 2007 is at page 3 of Exhibit G.  It is directed from Matson to Cartwright as the freight forwarder.  It concerns a shipment of HHG from Hawaii to Norfolk, Virginia.  Matson notes that the shipment is 'DOD SPONSORED."  The first line under "Charges" sets out the basic freight charge.  The fuel surcharge appears three lines below.  It is labeled as a "Fuel Related Surcharge."   The amount of the "Fuel Related Surcharge" is $513.00.  How this amount was determined is not set forth.  Nor does the freight bill state that any portion of the "Fuel Related Surcharge" is actually not a bunker surcharge.  The bill also does not include information from which one could determine what portion of the fuel surcharge is a rail or truck surcharge, or what portion is in fact a bunker surcharge.  The November 20, 2007 freight bill is representative of the thousands of freight bills Matson prepared and presented to freight forwarders and their billing agents until a date in 2012.

51.     Matson prepared and presented freight bills for the Subject Shipments that falsely and fraudulently combined prohibited rail surcharges with actual bunker surcharges; did not set forth the actual amount of the bunker surcharge; did not separately set forth the bunker surcharge; did not set forth the amount of the prohibited surcharge included with the purported bunker surcharge; and did not

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    include the information required to calculate or deduct the amount of the included

2    prohibited surcharge.

3    **The Defendants Knowingly Caused Freight Forwarders and Billing Agents to Present False and Fraudulent Claims to the SDDC**

4

5    52.    The defendant Carriers caused freight forwarders and billing agents to

6    present false and fraudulent claims to the SDDC.  Freight forwarders and billing

7    agents prepared and presented to the SDDC payment vouchers that included the full

8    amount of the fuel surcharges the Carriers imposed, and used the Carriers' freight

9    bills as support for the purported bunker fuel surcharges that the forwarders "passed

10   through."

11   53.    Attached as Exhibit A are payment vouchers for the Subject Shipments

12   that correspond to the Horizon and Matson freight bills in Exhibits F and G; the

13   supporting freight bills are attached to the payment vouchers.  The vouchers

14   included in Exhibit A were prepared by a freight forwarder, Cartwright, or by its

15   billing agent/auditor Daycos.

16   54.    In each and every case, Cartwright and Daycos prepared and presented

17   to the SDDC a payment voucher that included a purported "bunker" surcharge that

18   matched the amount of the "BS BUNKER SURCHARGE" or "BS Fuel Surcharge"

19   included on the corresponding Horizon freight bill.  Likewise, Cartwright and

20   Daycos prepared and presented payment vouchers for the Matson shipments that

21   included a purported "bunker" surcharge that was equal to the "Fuel Related

22   Surcharge" on the corresponding Matson freight bill.

23   55.    In each and every case, Cartwright and Daycos also certified that the

24   purported bunker surcharge was supported by a bill from the Carriers and was

25   accurate.  For example, on page 9 of Exhibit A, "B Day" of Daycos certified, "[f]or

26   payment of services rendered as evidenced by attached subvouchers," that "the

27   account stated hereon, as evidenced by the attached subvouchers, is correct and just

28   . . . ."

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

56.     The GBL at page 12 of Exhibit A is representative of the payment vouchers prepared and presented as a result of the Horizon freight bills.  On the "PUBLIC VOUCHER," Daycos, the billing agent for Cartwright for this shipment, included a "BSC, Bunker S/C" in the same amount as the "BS BUNKER SURCHARGE" on the Horizon bill at Exhibit A page 14, namely, $1,323.10, and "B Day" certified that the surcharge was correct.  (many of the payment vouchers were amended after their initial submission, to make corrections, add late charges such as storage in transit ("SIT"), or other related reasons)

57.     The payment voucher at Page 19 of Exhibit A is representative of those prepared and presented as a result of the Matson freight bills.  On the "PUBLIC VOUCHER," Daycos included a "BSC, Bunker S/C" in the same amount as the "FUEL RELATED SURCHARGE" on the Matson Bill, page 21, $507.00, and "B Day" certified that the surcharge was correct.

58.     The payment vouchers the Carriers caused freight forwarders and their billing agents to prepare and present were false and fraudulent.  The fuel surcharges included were not in fact bunker surcharges; the purported bunker surcharges were inflated by at least the amount of line haul surcharges, including prohibited rail surcharges more than 90% of the time. The payment vouchers are requests and demands for money that are presented to an officer, employee, or agent of the United States.

59.     The freight forwarders' payment vouchers "pass through" the full amount of the false and fraudulent fuel surcharges imposed by Defendants  They incorporate the full amount of the fuel surcharges imposed by Defendants, including the prohibited surcharge for the rail or line haul transport.  Freight forwarders therefore claimed payment for fuel surcharges that were inflated and unauthorized by the Rate Solicitation and TR-12.  The amount of the surcharge was false and fraudulent; the bill of lading did not separately state the bunker fuel surcharge separate and apart from the fuel surcharge on the line haul transport; and

1   the amount of the fuel surcharge was not the "actual amount" of the bunker fuel

2   surcharge.

3       60.     Freight forwarders, as the Carriers knew and intended, relied upon and

4   used the freight bills presented by the Defendants as support for the payment

5   vouchers they submitted to the SDDC.  When DoD relied on paper invoices, freight

6   forwarders included the false and fraudulent bills from the Defendants with their

7   bills to the SDDC.  After the SDDC computerized the billing system for the type of

8   shipments at issue, in or around 2010, freight forwarders incorporated the false and

9   fraudulent fuel surcharges imposed by Defendants in their bills to the SDDC, and

10  maintained copies of the Ocean Carriers' freight bills to be available for review by

11  the SDDC.  In both time periods, freight forwarders relied upon the false and

12  fraudulent billings to support its claims to the SDDC and Defendants made and

13  presented them to freight forwarders in order to cause the freight forwarders to

14  submit false and fraudulent claims and to provide false writings in support of those

15  claims.

16      61.     The payment vouchers attached as Exhibit A are representative of how

17  freight forwarders billed the government, passing through the full fuel surcharge

18  imposed by the ocean carriers, including its unlawful rail and line-haul components.

19  From his years of experience in the industry, and numerous discussions about

20  billing practices with freight forwarders from many different companies, in his role

21  as the chair of the Carrier Relations Committee or otherwise, Relator is able to aver

22  that freight forwarders routinely passed through the entire ocean carrier fuel

23  surcharge.

24      62.     The Defendants caused freight forwarders and their billing agents to

25  prepare and present false claims.  Approximately 200 freight forwarders handled

26  the Subject Shipments and their or their billing agents prepared and presented to the

27  SDDC payment vouchers that were similar to those attached as Exhibit A in all

28  material respects.  Approximately 200 freight forwarders did not independently

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP

ATTORNEYS AT LAW

SAN FRANCISCO

decide to overcharge and defraud the SDDC; the Carriers caused the forwarders to submit payment vouchers that included false and inflated bunker surcharges and disallowed rail and truck surcharges.

63.     Numerous features of the Carriers' freight bills caused freight forwarders and billing agents to pass through the full fuel surcharges included to the SDDC.

64.     On its freight bills, Horizon explicitly represented to freight forwarders that the fuel surcharges included were bunker surcharges.  Horizon labeled the fuel surcharge "BS BUNKER SURCHARGE," or "BS Fuel Surcharge."  Horizon also noted on its freight bills that the shipments involved were "DOD SPONSORED" of "MIL HHG."  These false and fraudulent labels assured freight forwarders that Horizon knew the shipment was for the SDDC, that the charge was a bunker surcharge, and that no further review or adjustment was necessary.  The label "BS" alone prevented further inquiry and caused freight forwarders and billing agents to pass through the full surcharge to the SDDC as a bunker surcharge.

65.     Both Carriers set forth a single fuel surcharge, and did not separately break out the actual bunker surcharge and the intermodal surcharge.  Knowing the goods were transported by ship and that a bunker surcharge would appear on the Carriers' freight bill, when forwarders saw a single fuel surcharge on the bill, they reasonably and foreseeably concluded it was a bunker surcharge.  The CEO of the largest billing agent in the country, Daycos, has publicly stated that his company understood the fuel surcharge on Matson's freight bills to be a bunker surcharge for just this reason.   Daycos bills the SDDC on behalf of a large portion of the freight forwarders that handle the Subject Shipments.  Relator estimates that Daycos is a billing agent for in excess of 40% of the freight forwarders.  In approximately August 2010, Brandon Day, the CEO of Daycos, wrote, "Matson's OBLs [ocean bills of lading] have always been a bit different in that their Bunker Fuel Surcharge has always just been labeled 'Fuel Related Surcharge.'  Since this has been the only

1   fuel related item on the OBL, it was clear that this was the Bunker charge, and we

2   billed it as such."

3       66.    In other markets – i.e., not in the Hawaii/Guam-CONUS market, ocean

4   carriers, including Horizon, handled fuel surcharges on intermodal shipments

5   differently.  The fact Horizon and other carriers separately stated the two types of

6   surcharges on freight bills for HHG shipments in other regions also caused freight

7   forwarders to conclude that the single surcharge on the Carriers' freight bills was a

8   bunker surcharge, and not a bunker plus.

9       67.    The fact the Carriers' freight bills did not include the information a

10  freight forwarder would have needed to deduct any disallowed portion of the

11  surcharge also conveyed that no adjustment was necessary before passing through

12  the charge.

13      68.    The Carriers caused the submission false claims also because the

14  forwarders and agents could not have presented inflated and false payment

15  vouchers without or but for the Carriers' freight bills.  The Rate Solicitation

16  provided that forwarders' payment vouchers had to be supported by invoices

17  including a charge for the same amount the forwarder sought; the fuel surcharge on

18  the GBL had to match the fuel surcharge on the Carriers' freight bill or the SDDC

19  would not accept it.  Without freight bills from the Carriers that included a false and

20  inflated fuel surcharge, the forwarders and their agents could not have overcharged

21  the SDDC.

22      69.    The Carriers caused forwarders to submit false claims in addition in

23  that the Carriers prevented the forwarders from preparing and submitting accurate,

24  non-fraudulent payment vouchers.  In order to prepare payment vouchers that

25  included only true bunker surcharges, forwarders had to know both that the

26  surcharge on the freight bill included a prohibited rail surcharge, and the amount of

27  either the bunker surcharge alone, or the amount of the rail surcharge, to make the

28  necessary deduction.  The Carriers, however, did not provide that information or a

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

means to determine the necessary adjustment.  The Carriers prevented the forwarders from preparing anything other than false payment vouchers.  Furthermore, even if the forwarder somehow realized a prohibited surcharge was included and somehow figured out a way to determine the amount to deduct, the Rate Solicitation – as Defendants knew – required the forwarders to claim a bunker fuel surcharge in the "actual amount" set forth on the carriers' invoices, (Exh. B, Bates p. 71) and paid by the freight forwarder to the carrier.

70.     The Carriers further, repeatedly represented that the fuel surcharges they imposed were driven by and based upon the costs they incurred for ship or bunker fuel, that is that the surcharges were for bunker fuel.  Exhibit H is a press release issued by Matson on June 13, 2008 announcing an increase in the fuel surcharge for its Hawaii service.  The release explains the increase to be the result of the rising price of bunker fuel, and explains the steps Matson was taking to reduce fuel consumption by its ships, noting that Matson was operating its "containerships" at reduced speeds, and had acquired new highly fuel efficient "vessels . . . [for] its fleet."  Exhibit I is another Matson press release, dated September 3, 2010, explaining a reduction in fuel surcharge "As a result of recent declines in bunker fuel prices, as well as benefits from Matson's fuel conservation and fleet optimization efforts . . . ."

71.     When it was directly asked, Matson specifically told Cartwright that freight forwarder TSPs could bill the government the full fuel surcharge Matson imposed on shipments of the type here involved.  In August 2010, Ken Selvey of Cartwright and John Rowan of Matson exchanged emails concerning differences between "multi-factor" rates where a forwarder's price was based on multiple separate legs – an ocean rate with a fuel surcharge plus an overland rate with a separate surcharge – and "single factor" rates, where a single rate was charged for all legs of the transport, and a single fuel surcharge was reflected on the freight bill.  While Matson claimed that it would calculate the charge under both scenarios and

bill the forwarder for whichever one was lower cost, this posed problems for the freight forwarders.  On August 24, 2010, in an e-mail with the subject line "Clarification on what we can 'pass thru' with Uncle Sam," Selvey asked Rowan: "John, Is Matson taking into consideration the past thru of the bunker vs. the fact we cannot past thru the fuel surcharge on the inland hauling when rating the lowest price for the us to be billed at?"  (Exhibit J)  Rowan responded that while a single factor rate might produce a higher initial rate, the forwarder might nevertheless prefer the single factor rate  because the entire fuel surcharge could be billed to the SDDC.  Rowan wrote: "The Single-factor rate only has one fuel surcharge line item and although this rate model may produce a higher all-in rate, *the TSP [freight forwarder] can bill the US Government for full fuel recovery*." (Id.; Emphasis added)  In short, Matson not only knew freight forwarders were passing through the entire fuel surcharge, they told them to do so.

72.    Matson frequently referred to the fuel surcharge it assessed on the Subject Shipments as a "bunker," further causing forwarders to regard it as a such. For example, on January 21, 2011, Matson sent an e-mail to freight forwarders concerning "Matson Hawaii & Guam Household Goods Rates: DP3-I11."  (Exhibit K)  Matson advised in that e-mail that forwarders would, "receive a freight bill from Matson for Hawaii ocean transportation, only or a thru rate to the destination Port Agent, as requested, plus the applicable bunker fuel surcharge."  Similarly, on February 9, 2011, a forwarder inquired by e-mail of John Rowan at Matson ,who the forwarder, "could periodically check with to see what the current bunker fee is?" (Exhibit L)  Rowan replied that Matson informed its customers of changes in surcharges by mass emails, and that any "[d]ecreases in Fuel Surcharge are immediately applied."  Asked about a "bunker fee," Rowan understood and referred to what Matson called its fuel surcharge.

73.    The Carriers caused the freight forwarders to submit false payment vouchers to the SDDC.  The forwarders could not have submitted false claims

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

without or but for the Carriers' freight bills; the preparation and submission of false payment vouchers was the intended, natural and foreseeable result of the Carriers' actions; and the submission of false payment vouchers by the forwarders was intended by the Carriers and the goal of their fraudulent scheme.

### Defendants Acted Knowingly

74.     The Carriers acted knowingly when they caused freight forwarders and their agents to prepare and submit false and inflated GBLs and payment vouchers to the government.  The Carriers knew that their actions and freight bills caused forwarders to submit GBLs and payment vouchers that included the full fuel surcharges on the Carriers' freight bills.  The Carriers also deliberately ignored and recklessly disregarded information that the forwarders were submitting false and inflated claims for payment.

75.     The Defendants are sophisticated parties, well acquainted with the SDDC rules, including the Rate Solicitation and TR-12.  They employ professional staff, some of whom have job responsibilities that include serving the military HHG trade and being familiar with the related rules and regulations.

76.     Defendants were familiar with the requirements of the Rate Solicitations and with the provisions of TR-12.  Both Carriers employed personnel responsible for the shipping of military HHG.  Military HHG shipments are a substantial market, and account for a large portion of each of the Defendants' businesses in the regions involved.  The employees of the Defendants who had responsibility for this area and who were aware of the terms and content of the Rate Solicitations and TR-12 were: at Matson, John Rowan, who was the "Manager, National Accounts/Household Goods"; and at Horizon, Hugh Healey, who served as the "Director, Government Sales & Marketing."

77.     The Defendants knew, deliberately ignored, and recklessly disregarded: that the Rate Solicitation and TR-12 prohibited rails surcharges and truck surcharges in excess of a specified benchmark; that the fuel surcharges on

1    their freight bills included prohibited rail surcharges on Subject Shipments where
2    the line haul transport was by rail; that, as set forth above, their freight bills and
3    communications indicated that the fuel surcharges on their freight bills were bunker
4    surcharges (and not a bunker surcharge plus a disallowed rail surcharge).

5         78.    The Carriers knew that if they raised the fuel surcharge they assessed,
6    as they frequently did, freight forwarders would complain loud and often if they
7    were unable to pass the surcharge through to the SDDC.  The size of the surcharges
8    and the economics of the forwarding business, the Carriers knew, made it
9    impossible for the forwarders to accept disallowed fuel surcharges.  This created an
10   economic incentive for the Carriers to hide rail and excessive truck surcharges.

11        79.    That the forwarders could not absorb the prohibited fuel surcharges,
12   combined with the fact the Carriers' freight bills did not include the information a
13   forwarder would have needed to deduct prohibited rail surcharges, confirmed for
14   the Carriers that the forwarders understood the charge to be fully reimbursable and
15   were passing it through to the SDDC.  If forwarders realized the fuel surcharges on
16   the Carriers bills were not bunker surcharges and that other disallowed surcharges
17   had to be subtracted, they would have been contacting the Carriers to complain and
18   to obtain the information required to make their bills to the SDDC accurate and
19   non-fraudulent.  From the absence of hundreds of complaints and phone calls, the
20   Carriers knew the government was being overcharged, and that their freight bills
21   were being used to support the false and inflated claims.  The Carriers deliberately
22   ignored and recklessly disregarded this information, and kept turning out false and
23   deceptive freight bills.

24        80.    The Carriers' intent is evident from and confirmed by the manner in
25   which they chose to set forth the bunker and rail or truck surcharges on their freight
26   bills.  There was no legitimate purpose for the Carriers to combine together the
27   ocean and overland surcharges, or to fail to include information necessary to
28   determine the presence or amount of the prohibited surcharges.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

81.     At the same time it was concealing prohibited rail and excessive truck surcharges for shipments of military HHG in the Pacific, Horizon was preparing freight bills for shipments of HHG between Puerto Rico and CONUS that disclosed the two charges and the amounts of each, which bills were accurate and non-fraudulent in this respect.  For shipments of HHG between Puerto Rico and CONUS, Horizon assessed both a "fuel surcharge" for the ocean transport, and a separate "intermodal fuel surcharge."  (Exhibit D at Bates 153-154)  Horizon knew these freight bills were accurate and non-fraudulent, and likewise knew that the completely different freight bills it utilized in the Pacific for the same type of shipments were fraudulent.   Horizon utilized different freight bills in these two regions because in the Pacific Matson was utilizing fraudulent freight bills, but Matson had no ships in that served Puerto Rico and other competitors in that area set forth separate ocean and intermodal surcharges on their freight bills.  The form of the freight bills Horizon used for shipments of HHG to and from Puerto Rico also demonstrates that Horizon understood the Rate Solicitation and TR-12 and acted knowingly.  That freight forwarders who handled shipments both in the Pacific and to and from Puerto Rico saw separate surcharges on Horizon's freight bills for Puerto Rico shipments, also made it appear that the single surcharge included in Horizon's freight bills for transport of HHG in the Pacific was not inflated and did not include a surcharge on overland transport.

82.     Matson too knew the difference between an accurate non-fraudulent freight bill that separately set forth the bunker and intermodal fuel surcharges and its own bills.  Like Horizon, Matson too decided to combine the two surcharges on its freight bills, knowing and intending that this would cause freight forwarders to overcharge the government.  That Matson knew how to prepare non-fraudulent freight bills, but chose to do otherwise, is confirmed by events in mid-2010.  In approximately June 2010, Matson offered freight forwarders the option of using "single-factor" or through rates, or "multi-factor" rates, where the ocean and

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

overland portions were subject to separately quoted rates.  At the same time, for multi-factor shipments, Matson began to separately identify on its freight bills the fuel surcharge on the ocean transport, and the fuel surcharge on the overland transport.  For "single-factor" intermodal shipments, Matson continued to impose a single fuel surcharge and did not disclose that the surcharge included a non-reimbursable portion related to line haul transport.

83.    As to the multi-factor option, Matson assured the freight forwarder community that it would falsely label any fuel surcharge on the line-haul portion as a "bunker fuel surcharge," to make sure the freight forwarder could pass through the fuel surcharge to the SDDC.  In a communication to freight forwarders, Matson included the following "frequently asked" question and answer:

Q:  [By a freight forwarder]  I need to pass-thru the Fuel surcharge.  How will this appear on my Matson freight bill?

A:  [By Matson]  Fuel assessed on the ocean freight portion will read: Fuel Related Surcharge.  Fuel assessed on the inland line-haul portion will read: Bunker Fuel Surcharge.

84.    Matson began issuing new false and fraudulent freight bills consistent with the above in approximately June 2010.  Matson's freight bills in this period falsely and fraudulently labeled the line haul fuel surcharge as a "bunker fuel surcharge."

85.    Less than three months later, Matson curtailed its new billing practices.  Matson became concerned that the two different billing methods – and the fact that for one form of service there was a single surcharge imposed that included an undisclosed non-reimbursable component – might cause the SDDC to discover the false and fraudulent nature of the Carriers' billings, and again changed its billing practices.

86.    When it communicated this decision to freight forwarders in early August 2010, Matson stated that the ocean or bunker and inland fuel surcharges on

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

its freight bills had been "inadvertently mislabeled," with the labels switched (the bunker surcharge was called a "fuel related surcharge" and the intermodal surcharge was labeled as the "bunker") and that it was correcting this purported mistake.  Matson, however did not correct how it labeled the fuel surcharges on its freight bills for either the ocean transport or the inland line haul, or make its billings accurate.   Instead of making its freight bills truthful and non-fraudulent – by simply swapping the mistaken labels so the surcharge on ocean transport was accurately described as a bunker surcharge and the surcharge on the inland or line haul transport was correctly identified as a rail or line haul surcharge – Matson chose to again combine the two.  Matson decided to supposedly fix its "inadvertent mislabeling" not by correcting the labels, but instead by again combining the two surcharges and thereby again burying and concealing the inland or line haul portion of any intermodal shipment where rail transport was used.  From August 15, 2010, until mid-2012, Matson again prepared and submitted false and fraudulent freight bills that combined the two fuel surcharges into a single, inflated, false and fraudulent surcharge.  Matson plainly knew how to prepare accurate non-fraudulent freight bills that separately and accurately labeled the bunker and rail or truck surcharge, but decided not to.

87.     The Carriers' wrongful intent is evident from the directions they provided to freight forwarders as well.  Horizon, by steadfastly labeling the surcharge on its freight bills as a "BS" or bunker surcharge was effectively telling forwarders that they could pass through the charge as a BS without adjustment.  While Matson used a more generic label, it gave forwarders the same instruction.  As alleged above, when Matson gave freight forwarders the option of shipping HHG with a multi-factor rate or a through rate, Matson specifically advised Cartwright that it could, "bill the US Government for full fuel recovery."  While the many ways in which Matson indicated to freight forwarders that the fuel surcharge on its freight bills was a bunker surcharge and fully reimbursable raised no doubts,

1    when a freight forwarder asked, Matson expressly assured the forwarder the

2    surcharge could be billed to the government in full.

3        88.    The lack of any legitimate purpose for combining the ocean/bunker

4    surcharge with the overland/rail or truck surcharge on their freight bills, and the

5    Carriers' wrongful intent, is also confirmed by how the Defendants began to

6    prepare their bills since this lawsuit was filed.  The filing of this suit triggered an

7    investigation by the United States.  After the Carriers learned of this investigation,

8    they changed their practices and rate structure.

9        89.    Matson published military HHG rates applicable to the Defense

10   Personal Property Program IT-2012, covering June, 2012 to May, 2013, on or about

11   June, 2012.  In a departure from their earlier rate guides, the IT-2012 rates included

12   a "bunker adjustment factor" in a fixed dollar amount, that did not change, no

13   matter whether the shipment was going to the west coast, gulf coast, or east coast.

14   The surcharge no longer increased if the shipment included overland transport by

15   rail.  Matson's military HHG rates for IT-2013 included separate columns breaking

16   out the ocean freight charge from the inland rate on intermodal shipments, and

17   stating that rates were "subject to a current Bunker Adjustment Factor of 43.5% on

18   the ocean component only."   Thus, in both the IT-2012 and IT-2013 rate guides,

19   Matson began to correctly apply its "BAF" to the ocean rates only, and set forth the

20   actual amount of the bunker surcharge.

21       90.    Horizon also dramatically changed its billing practices.  On or about

22   January 25, 2013, Horizon published a rate sheet for IT-2013, effective May, 2013,

23   which showed rates per channel and included separate columns for "ocean freight"

24   and rail transport.  The rates included an "Ocean FAF" which was applied to the

25   ocean freight component only; the rates specifically stated that inland transportation

26   to a rail ramp was "not subject to FAF."

27       91.    The Defendants' knowledge and intent is also evidenced by events in

28   late 2006 and  2007 around the time the prohibition on rail surcharges in TR-12

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

became effective. Daycos announced in 2007 that it would not treat fuel surcharges for the overland portion of intermodal shipments as reimbursable by the SDDC; i.e., that it would not seek to "pass through" overland or line haul fuel surcharges to the SDDC. In addition, an ocean carrier named Trailer Bridge prepared bills that complied with SDDC rules and separately identified a "bunker fuel surcharge," and an "intermodal fuel surcharge" on its shipments between CONUS and Puerto Rico. Both of these matters came to the Defendants' attention as members of the Carrier Relations Committee of an industry trade group, called at that time the Household Goods Forwarders Association of America ("HHGFAA"); Relator was at the time the chair of the Carrier Relations Committee. The Carrier representatives included John Rowan of Matson, and Ed Bertie of Horizon. Ken Selvey of Cartwright was also a member of the committee. Following discussions between members of the Carrier Relations Committee, Selvey communicated with Trailer Bridge. In approximately August 2007, Selvey asked Trailer Bridge to combine its bunker fuel surcharge with its intermodal fuel surcharge, and to label the combined surcharge as a bunker fuel surcharge; i.e., to do precisely what Defendants were already doing. Trailer Bridge refused to do so, and communicated its refusal in an email to Selvey dated August 22, 2007.

92.    These communications confirm that the Carriers were aware of TR-12, that they knew other carriers were preparing freight bills that separately and accurately identified bunker and intermodal fuel surcharges, and that their own billings could and should be modified to make them accurate and non-fraudulent.

### Identifying the Claims at Issue

93.    Plaintiff estimates that approximately 100,000 GBLs/payment vouchers for Subject Shipments were presented to the United States by approximately 200 different freight forwarders during the relevant time period. The payment vouchers attached as Exhibit A are representative of the claims at issue.

94.     Horizon created and presented an extremely large number of freight bills that were similar in all material respects to Exhibit F.  Based on data regarding the total number of military HHG shipments between Hawaii, on the one hand, and specific east coast and gulf coast ports/rail ramps (Baltimore, Charleston, Jacksonville, and Houston), on the other hand, from 2005-2012, and taking account of Horizon's market share in those channels, which upon information and belief is approximately 40%, Horizon in those channels alone acted as the ocean carrier, and submitted freight bills to freight forwarder TSPs on approximately 40,000 occasions.  Horizon made and presented similarly false and fraudulent freight bills for shipments of military HHG for the SDDC totaling approximately the following amounts in the following periods:

| Horizon Shipments to/from BAL, CHS, JAX, and HOU and | | | | |
|---|---|---|---|---|
| | Hawaii | | Guam | |
| | Number of Horizon Shipments Made/Claims Submitted (Approx.) | Pounds of Military HHG Shipped by Horizon (Approx.) | Number of Horizon Shipments Made/Claims Submitted (Approx.) | Pounds of Military HHG Shipped by Horizon (Approx.) |
| **2005** | 5,100 | 26,200,000 | 600 | 2,700,000 |
| **2006** | 4,900 | 24,900,000 | 700 | 3,300,000 |
| **2007** | 5,000 | 25,400,000 | 600 | 3,200,000 |
| **2008** | 5,500 | 28,500,000 | 600 | 2,900,000 |
| **2009** | 4,300 | 19,500,000 | 400 | 2,100,000 |
| **2010** | 5,300 | 27,000,000 | 600 | 3,000,000 |
| **2011** | 6,100 | 30,900,000 | 600 | 2,900,000 |
| **2012** | 5,000 | 25,600,000 | 500 | 2,200,000 |
| **Total** | **41,200** | **207,900,000** | **4,600** | **22,200,000** |

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

95.     With respect to Matson, based on the same data, and taking account of Matson's market share in those channels (upon information and belief, approximately 55% in the Hawaii market and 60% in the Guam market), Matson in those channels alone acted as the ocean carrier, and submitted freight bills to freight forwarder TSPs on approximately 62,000 occasions.  Matson made and presented false and fraudulent freight bills similar to that in Exhibit G for shipments of military HHG for the SDDC totaling approximately the following amounts in the following periods:

| Matson Shipments to/from BAL, CHS, JAX, and HOU and | | | | |
|---|---|---|---|---|
| | **Hawaii** | | **Guam** | |
| | Number of Matson Shipments Made/Claims Submitted (Approx.) | Pounds of Military HHG Shipped by Matson (Approx.) | Number of Matson Shipments Made/Claims Submitted (Approx.) | Pounds of Military HHG Shipped by Matson (Approx.) |
| **2005** | 6,900 | 35,100,000 | 900 | 4,000,000 |
| **2006** | 6,600 | 33,400,000 | 1,000 | 4,900,000 |
| **2007** | 6,700 | 34,100,000 | 1,000 | 4,800,000 |
| **2008** | 7,400 | 38,300,000 | 900 | 4,300,000 |
| **2009** | 5,700 | 26,200,000 | 700 | 3,100,000 |
| **2010** | 7,200 | 36,200,000 | 900 | 4,500,000 |
| **2011** | 8,200 | 41,400,000 | 900 | 4,400,000 |
| **2012** | 6,600 | 34,300,000 | 700 | 3,300,000 |
| **Total** | **55,200** | **278,900,000** | **7,000** | **33,300,000** |

96.     As described above, when one of the 200 freight forwarders received one of these approximately 100,000 freight bills from Defendants, the freight forwarder or its billing agent submitted a claim for payment to the government that "passed through" the full amount of the purported bunker surcharge reflected on those freight bills, including the prohibited rail surcharge.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

97.     Relator does not have access to and cannot identify each of the thousands of false claims submitted by each of the 200 freight forwarders, or each of the thousands of freight bills prepared by Carriers in support of those false claims.  However, these claims will be readily identifiable by Defendants from records in their possession, custody and control.  As set forth on the freight bills attached at Exhibits F and G, Defendants' shipment records include identification of the HHG shipments as military or DOD-sponsored.  Within that class of DOD-sponsored HHG shipments, upon information and belief Defendants will be able to identify those CONUS intermodal shipments that originated or terminated in the limited number of Hawaii and Guam ports.  In addition, Exhibits F and G demonstrate that Defendants record the GBL number for each shipment, and this GBL number can be used to confirm submission of the claim to the government.

98.     The single, consolidated fuel surcharge is false and fraudulent because the true or actual bunker surcharge is not set forth and also is not separately stated.  The Rate Solicitation required that the freight bills set forth the "actual amount" of the bunker fuel surcharge (not a bunker fuel surcharge plus a disallowed rail fuel surcharge) and that the bunker fuel surcharge be set forth "separately" (and not combined with another surcharge).

99.     The provisions of the Rate Solicitation and TR-12, including compliance with the limits and prohibits related to fuel surcharges for inland transport, were conditions of payment.  The SDDC would not have paid the fuel surcharges involved had the SDDC known the true facts and specifically that the fuel surcharges claimed by the freight forwarders based on  the Defendants' bills covered rail and line haul transportation, and therefore were not bunker fuel surcharges as authorized and permitted by the Rate Solicitation and TR-12.

100.    The freight bills prepared and presented by the Defendants, and the billings submitted to the government by freight forwarders based upon the freight bills from the Defendants, were materially false and fraudulent.  The government

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  would not have paid the fuel surcharges included on the GBLs submitted to the

2  government, or accepted the freight bills from the Carriers as sufficient support for

3  the surcharges set forth on the GBLs, had the government known the true facts.

4    101.   The United States and the DoD, including the United States Navy, Air

5  Force, Army Marine Corp., and Coast Guard, have been damaged as a result of

6  Defendants' illegal conduct; the government has paid higher fuel surcharges than

7  allowed on overland transportation.  The evidence necessary to determine the exact

8  amount of damage is within the exclusive control of Defendants and unavailable to

9  Relator.

10              **CLAIMS FOR RELIEF**

11                 **Count 1**

12  Submitting False Claims in Violation of the False Claims Act,
     31 U.S.C. section 3729(a)(1)(A)

13

14    102.   The allegations contained in paragraphs 1 through 100 are

15  incorporated by reference as if fully set forth herein.

16    103.   Through the acts described above, Defendants, and each of them,

17  caused to be presented, and presented, false or fraudulent claims for payment or

18  approval.  The Carriers caused freight forwarders and their billing agents to present

19  false and fraudulent claims to an officer, employee and agent of the United States,

20  specifically GBLs and payment vouchers to the SDDC.  The Carriers, and each of

21  them, also presented false and fraudulent claims for payment to contractors, such as

22  Cartwright, where the money was to be spent and used on the Government's behalf

23  and the Government was to provide or had provided a portion of the money

24  demanded.

25    104.   The Defendants and each of them acted "knowingly" as defined in the

26  False Claims Act.  At a minimum they acted in deliberate ignorance of the truth or

27

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

falsity of information as alleged above, and acted in reckless disregard of the truth or falsity of information as alleged above.

Wherefore, Relator prays for relief as set forth below.

### Count 2

Making False Records Material to a False or Fraudulent Claim in Violation of the False Claims Act, 31 U.S.C. section 3729(a)(1)(B)

105.   The allegations in paragraphs 1 through 103 are incorporated by reference as if fully set forth herein.

106.   As set forth above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims to the United States.  The Carriers created freight bills they knew would be used by freight forwarders and their billing agents to support the false and inflated GBLs and payment vouchers presented to the SDDC.

107.   The Defendants and each of them acted "knowingly" as defined in the False Claims Act; acted in deliberate ignorance of the truth or falsity of information as alleged above; and acted in reckless disregard of the truth or falsity of information as alleged above.

Wherefore, Relator prays for relief as set forth below.

### RELIEF REQUESTED

108.   Relator prays for judgment against the Defendants, and each of them, as follows:

(a)   For damages in an amount equal to three times the amount of the damages the United States has sustained as a result of each defendant's unlawful conduct;

(b)   For civil monetary penalties for each false and fraudulent claim submitted to the United States;

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(c)     For a permanent injunction, enjoining the Defendants from violating the False Claims Act;

(d)     For Relator's attorneys' fees and costs;

(e)     For an order awarding the Relator the maximum award allowed by the False Claims Act; and

(f)     For such further relief as the Court may deem proper and just.

Dated:     October 15, 2013     GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP


By:  /s/ Wayne T. Lamprey
Wayne T. Lamprey
Attorneys for Plaintiff-Relator
Mario Rizzo

## CLAIM OF RIGHT FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated:     October 15, 2013     GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP


By:  /s/ Wayne T. Lamprey
Wayne T. Lamprey
Attorneys for Plaintiff-Relator
Mario Rizzo

3405/001/X156411.v1